UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| AMERICAN GENERAL LIFE INSURANCE COMPANY, | ) ) ) | File No. 11-5057-JLV |
| Plaintiff, | ) ) ) | **MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | ) ) | |
| AMY JENSON, | ) ) ) | |
| Defendant. | ) | |

Comes now the Defendant, and respectfully submits her memorandum in support of the motion for summary judgment. For the reasons stated herein, Defendant requests that summary judgment be granted in her favor and that she be declared the beneficiary to the life insurance proceeds at issue.

**PROCEDURAL AND FACTUAL BACKGROUND**

On July 8, 2011 the Plaintiff caused to be filed the present declaratory judgment and interpleader action. (Doc 1) Defendant Amy Jenson ("Amy") answered on July 13, 2011. (Doc 7) At issue is a determination as to the proper beneficiary of certain proceeds from a life insurance policy issued by the Plaintiff on the life of Patrick Jensen ("Pat"). Amy is the named beneficiary on the policy and the only person having made a claim to said proceeds. She is also the only defendant in this action. For purposes of the present motion, the following facts are undisputed.

Amy and Pat were married at Sylvan Lake in the Black Hills of South Dakota on July 5, 2003. Defendant's Statement Of Undisputed Material Facts No. 1 (hereinafter Def. Stmt. Und.

Mat. Facts No. __). Pat and Amy grew up in the eastern part of the state and prior to their marriage had dated for fifteen years, since both were in high school. Def. Stmt. Und. Mat. Facts No. 2. Following high school, Pat and Amy attended college together at South Dakota State University and the University of South Dakota. Def. Stmt. Und. Mat. Facts No. 3. Amy earned a Bachelor of Science degree in psychology from South Dakota State University and a Master's Degree in Occupational Therapy from the University from South Dakota in 1996. Def. Stmt. Und. Mat. Facts No. 4. Pat majored in history and psychology and was a few credits short of earning a Bachelor's degree. Def. Stmt. Und. Mat. Facts No. 5. Following graduation, Amy initially worked as an occupational therapist in Aberdeen and has spent the past thirteen years working for Rapid City Regional Hospital. Def. Stmt. Und. Mat. Facts No. 6.

During their marriage, Pat and Amy were blessed with two children, a son ("J.J."), d.o.b. [month/day redacted] 2004 and a daughter ("C.J."), d.o.b. [month/day redacted] 2006. Def. Stmt. Und. Mat. Facts No. 7. Throughout the course of Pat and Amy's marriage and continuing thereafter, the family resided at 201 Ray Ann Court, Rapid City, South Dakota 57702. Def. Stmt. Und. Mat. Facts No. 8.

In approximately 2002, both Pat and Amy established a client relationship with financial advisor Hugh Boyle of BMS Financial Advisors in Rapid City, South Dakota. Def. Stmt. Und. Mat. Facts No. 9. As part of the couple's financial planning checklist, Mr. Boyle recommended the purchase of life insurance for each, through Plaintiff American General Life Insurance Company ("American General"). Def. Stmt. Und. Mat. Facts No. 10. Two life insurance policies were ultimately issued by American General through Mr. Boyle's BMS Financial Advisors. Def. Stmt. Und. Mat. Facts No. 11. At all relevant times, Mr. Boyle served as the agent for American General for purposes of the life insurance policies at issue. Def. Stmt. Und.

2

Mat. Facts No. 12. The policies were "renewable level benefit term life" policies. Def. Stmt. Und. Mat. Facts No. 13.

Specifically, in our around April 2006, policy number YME0415059 was issued on Amy's life by the Plaintiff in the amount of $500,000.00 with Pat being named the beneficiary. Def. Stmt. Und. Mat. Facts No. 14. On approximately the same date, policy number YME0415058 was issued on Pat's life in the amount of $500,000.00 with Amy being listed as the exclusive beneficiary. Def. Stmt. Und. Mat. Facts No. 15. There was no contingent beneficiary listed on the policy issued on the life of Pat. Def. Stmt. Und. Mat. Facts No. 16. From the date policy number YME0415058 on Pat's life was issued until his passing, Amy agreed to pay the premiums out of her personal, separate checking account on a monthly basis. Def. Stmt. Und. Mat. Facts No. 17.

At some point after Pat and Amy had been married several years, Pat developed a problem with alcohol that became an issue in their marriage. Def. Stmt. Und. Mat. Facts No. 18. When Pat would not get the help he needed, Amy retained counsel and filed for divorce. Def. Stmt. Und. Mat. Facts No. 19. Amy expressed to Pat that he needed to get help with his drinking and the divorce served as a mechanism of incentive to encourage Pat to get the help he needed. Def. Stmt. Und. Mat. Facts No. 20. Pat did not contest the divorce. Def. Stmt. Und. Mat. Facts No. 21. Throughout the time the divorce was proceeding, Pat continued to live and reside in the family's martial home and in all respects Pat and Amy continued to function as a couple. Def. Stmt. Und. Mat. Facts No. 22. On February 24, 2008, the Court issued Findings Of Fact And Conclusions Of Law which granted a default judgment in Amy's favor on the divorce. Def. Stmt. Und. Mat. Facts No. 23.

Pat, in fact, did seek help for his drinking problems after the divorce. Def. Stmt. Und. Mat. Facts No. 24. Specifically, Pat sought and received inpatient assistance for alcoholism in Billings, Montana in 2007, the Keystone Treatment Center in 2008, and a 6-month inpatient stay at Teen Challenge At The Dakotas in Brookings, South Dakota in 2009. Def. Stmt. Und. Mat. Facts No. 24. Despite the struggles, Amy's witnessing Pat put forth the effort to get the help he needed allowed the couple to continue in their relationship. Def. Stmt. Und. Mat. Facts No. 25. Pat lived and resided in the family home on a full-time basis, but it was understood between the couple that if Pat was drinking, he was not allowed to be there. Def. Stmt. Und. Mat. Facts No. 26. Other than the situations where Pat had relapsed or was enrolled in a residential treatment facility, Pat and Amy continued to live at the same residence and under the same roof on an uninterrupted basis until Pat's passing. Def. Stmt. Und. Mat. Facts No. 27. Both prior to and after the divorce, Pat never had a separate, permanent residence other than the family's martial home in Rapid City. Def. Stmt. Und. Mat. Facts No. 28. As but one example, Pat listed the family home as his residence address for income tax purposes. Def. Stmt. Und. Mat. Facts No. 29.

Following the divorce, and in addition to the living arrangements, Pat and Amy continued to function in all respects as a couple, with martial relations and the raising of their two children continuing as before. Def. Stmt. Und. Mat. Facts No. 30. As but one small example of Pat and Amy's continuing relationship and the maintenance of the family unit despite the divorce, the family's Christmas cards for 2009 and 2010 included Pat, Amy and the children. Def. Stmt. Und. Mat. Facts No. 31. In letters written to the family by Pat during the times he was in residential treatment, he referred to scripture passages extolling Amy as his "wife." Def. Stmt. Und. Mat. Facts No. 32. At Pat's funeral, many relatives and friends who knew Pat and Amy as

a couple did not even know they had been divorced. Def. Stmt. Und. Mat. Facts No. 33. Pat and Amy's children did not know there was a divorce proceeding. Def. Stmt. Und. Mat. Facts No. 34.

Following the divorce, Pat and Amy had an agreement regarding child care, household and other expenses. Def. Stmt. Und. Mat. Facts No. 35. Pat paid Amy $500 per month toward all of the household bills combined, the $500 per month coinciding with Pat's child support obligation pursuant to parties' divorce stipulation. Def. Stmt. Und. Mat. Facts No. 36. The $500 per month was Pat's sole contribution to the family's household bills. Def. Stmt. Und. Mat. Facts No. 37.

As part of their overall post-divorce financial arrangements, an agreement between Pat and Amy existed regarding Amy paying the monthly premiums on Pat's life insurance policy, with Pat agreeing that Amy remain the designated beneficiary. Def. Stmt. Und. Mat. Facts No. 38. This agreement continued from year to year upon the parties' annual meeting with financial advisor Hugh Boyle. Def. Stmt. Und. Mat. Facts No. 39. After the divorce, Amy agreed to continue making these premium payments and Pat agreed that Amy was to remain the sole beneficiary under the policy. Def. Stmt. Und. Mat. Facts No. 40. Pat was well aware that Amy was paying the premiums on his life insurance policy and consented in all respects to the arrangement. Def. Stmt. Und. Mat. Facts No. 41. Specifically, Amy continued to make the monthly premium payments in the amount of $56.44. Def. Stmt. Und. Mat. Facts No. 42. Amy made these payments each and every month following the divorce until Pat passed away in January 2011. Def. Stmt. Und. Mat. Facts No. 43. The total amount paid by Amy pursuant to this arrangement was $1,918.00. Def. Stmt. Und. Mat. Facts No. 44. Amy would not have

5

continued to make the premium payments on Pat's policy if Pat did not agree to keep her as the beneficiary of said policy. Def. Stmt. Und. Mat. Facts No. 45.

During and following the divorce, Pat and Amy continued to work with financial advisor Hugh Boyle. Def. Stmt. Und. Mat. Facts No. 46. In addition to intermittent contacts which would be required regarding various accounts or transactions, it was Mr. Boyle's policy to meet with Pat and Amy on an annual basis to review their financial plan. Def. Stmt. Und. Mat. Facts No. 47. Mr. Boyle was aware that Pat and Amy had divorced. Def. Stmt. Und. Mat. Facts No. 48. These joint meetings with Mr. Boyle continued after the divorce. Def. Stmt. Und. Mat. Facts No. 49. One specific issue which was discussed with Pat and Amy each time they met with Mr. Boyle was the beneficiary designations on various accounts, including the life insurance contracts. Def. Stmt. Und. Mat. Facts No. 50.

Following the divorce, both in 2009 and 2010, Pat, Amy and Mr. Boyle reviewed all of their accounts and discussed among other things, the beneficiary designations on the life insurance and other accounts. Def. Stmt. Und. Mat. Facts No. 51. In each instance during their meetings following the divorce, Pat was specifically asked about his intention for beneficiary designation on the American General Life Insurance policy, and in both 2009 and 2010 affirmatively indicated and agreed that he wanted to keep Amy as his beneficiary. Def. Stmt. Und. Mat. Facts No.52.

From and after the time the contract of life insurance was issued, Pat never changed his beneficiary designation. Def. Stmt. Und. Mat. Facts No. 53. On January 14, 2008, Amy changed the beneficiary designation on her life insurance policy to her mother, Jeanne Lane, as custodian for her children. Def. Stmt. Und. Mat. Facts No. 54. Amy changed the beneficiary

designation on her American General policy back to Pat in or around June 2010. Def. Stmt. Und. Mat. Facts No. 55.

Having ascertained Pat's intent on multiple occasions during face-to-face meetings following the divorce, Plaintiff's agent Mr. Boyle did not believe that any further or additional action or documentation would be necessary to effect his client's stated intention regarding the life insurance beneficiary. Def. Stmt. Und. Mat. Facts No. 56. The intention of Pat regarding the beneficiary of the $500,000.00 life insurance policy sold by the Plaintiff was clear. Def. Stmt. Und. Mat. Facts No. 57. From the initiation of the policy and continuing forward uninterrupted and regardless of the divorce, it was Pat's express intent that Amy be the beneficiary of the proceeds. *Id.*

The most resent account summary of Pat's life insurance policy issued by the Plaintiff is dated March 9, 2011 and indicates Pat as the insured and identifies Amy as the beneficiary, without any reference to spouse or marital status. Def. Stmt. Und. Mat. Facts No. 58. The policy itself discusses beneficiaries, stating that, "[t]he beneficiary or beneficiaries are shown in the application unless changed." Def. Stmt. Und. Mat. Facts No. 59. Regarding the change of owner or beneficiary, the policy indicates that "[w]hile this policy is in force, the owner may change the beneficiary or ownership by written notice to us." Def. Stmt. Und. Mat. Facts No. 60. No such written notice was provided with respect to the beneficiary designation on Pat's policy, and at no time did Pat effect any change in the original designation as Amy as the beneficiary of his policy. Def. Stmt. Und. Mat. Facts No. 61.

Pat died on January 2, 2011. Def. Stmt. Und. Mat. Facts No. 62.

At the time of Pat's death, all of the premiums on policy YNE0415058 had been paid in full, with each and every payment being paid via automatic withdrawal through Amy's

individual checking account. Def. Stmt. Und. Mat. Facts No. 63. Pat listed no contingent beneficiaries nor are there any conflicting claims or claimants regarding the proceeds at issue. Def. Stmt. Und. Mat. Facts No. 64.

## ARGUMENT AND AUTHORITIES

### I. Summary Judgment Standard

The standard for summary judgment is well established:

> Summary judgment is appropriate if the moving party establishes that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *see* Anderson v. Liberty Lobby Inc., 477 US 242, 256, 106 SCt 2505, 91 LEd2d 202 (1986). In reviewing a motion for summary judgment, the Court views the evidence in a light most favorable to the non-moving party. *See* Adickes v. S.H. Kress & Co., 398 US 144, 158-59, 90 SCt 1598, 26 LEd2d 142 (1970). "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." Mansker v. TMG Life Ins. Co., 54 F3d 1322, 1326 (8th Cir.1995) (citations omitted).

The Cincinnati Insurance Company v. Pro Enterprises, Inc.; Pro-Built Management, Inc;, Gillette Hospitality Limited Partnership; and Hegg Companies, Inc., 394 FSupp 2d 1127, 1130 (DSD 2005)(declaratory judgment action). If there is no genuine issue about any material fact, summary judgment is proper because it avoids needless and costly litigation and promotes judicial efficiency. Roberts v. Browning, 610 F2d 528, 531 (8th Cir.1979); United States v. Porter, 581 F2d 698, 703 (8th Cir.1978). The summary judgment procedure is not a disfavored procedural shortcut. Rather, it is an integral part of the Federal Rules as a whole. Celotex Corp. v. Catrett, 477 US 317, 106 SCt 2548, 2555, 91 LEd2d 265 (1986), Summary judgment is appropriate against a party who fails to make a showing sufficient to establish that there is a genuine issue for trial about an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 106 *SCt 2553, See also* Anderson v. Liberty Lobby,

*Inc.*, 477 US 242, 106 *SCt 2505*, 2511, 91 LEd2d *202* (1986).; Jordan v. Hanks, 683 FSupp. 1298, 1299 (W.D.Mo.1988).

In this case, summary judgment is particularly warranted as there are no facts which will be in dispute, leaving only the application of the undisputed facts to the applicable legal standards.

**II.     Defendant Is Entitled To the Proceeds At Issue**

There is no question that the policy itself unequivocally provides that Amy is the beneficiary of the proceeds. Plaintiff has cited SDCL § 29A-2-804 as creating an issue or question on its part as to the proper beneficiary. Assuming the cited statutory provision applies to the proceeds which are the subject of this suit, the "revocation upon divorce" statute at most creates a presumption which can be rebutted by a showing of a decedent's clear intent to the contrary. In this matter, there is compelling and undisputed evidence that Pat's intent following the divorce was that Amy was to be and remain the beneficiary of the life insurance proceeds. As such, summary judgment is appropriately granted in Amy's favor. Alternatively, the referenced statute contains an exception where a contract exists regarding the beneficiary status of a former spouse. In this case, the parties had a contract that Amy was to remain as the beneficiary of the policy following the divorce, and as such, the statute does not serve to frustrate that intended purpose and Amy is likewise entitled to summary judgment.

   1. <u>Decedent's Intent Is The Paramount Purpose Of Uniform Probate Code</u>

As indicated above, the statue cited in Plaintiff's complaint is part of South Dakota's version of the Uniform Probate Code (UPC). As such, the statute should be read and interpreted to further the overall goals and intent of the UPC. The South Dakota Supreme court has advised:

9

> Statutes are to be construed to give effect to each statute and so as to have them exist in harmony. It is a fundamental rule of statutory construction that the intention of the law is to be primarily ascertained from the language expressed in the statute. In addition, we are statutorily mandated to interpret uniform laws such as the [UPC] "to effectuate its general purpose to make uniform the law of those states which enact it." SDCL § 2-14-13.[1]

In re Estate of Meland, 712 NW2d 1, 2 (SD 2006) citing In re Estate of Jetter, 1997 S.D. 125, ¶ 11, 570 NW2d 26, 29 (internal citations omitted); see also Link v. L.S.I., Inc., 793 NW2d 44, 50 (S.D. 2010); Glimcher Supermall Venture, LLC v. Coleman Co., 739 NW2d 815, 820 (SD 2007) (holding that case law from other jurisdictions can provide guidance in interpreting a uniform act).

The very first substantive section of the UPC expressly provides that "[t]his code shall be liberally construed and applied to promote its underlying purposes and policies." UPC 1-102(a). Particularly apt in the present case is the recognition in the UPC that the "underlying purposes and policies of this code are ... to discover and make effective the intent of a decedent in the distribution of his property[.]" UPC 1-102(b)(2). Said another way, the statute should be liberally construed and applied to make effective the intent of the decedent, Patrick Jenson.

Pat's intent regarding the beneficiary of the life insurance proceeds is undisputed. This includes his clear and unequivocal intention following the divorce. Amy was the intended beneficiary, a sentiment and agreement expressly communicated to Plaintiff's agent who placed the policy and renewed it every year.

2. SDLC § 29A-2-804 At Most Creates A Rebuttal Presumption

The only case in South Dakota which has interpreted SDCL § 29A-2-804 is Buchholz v. Storsve, 704 NW2d 197 (SD 2007). Buchholz involved a dispute between former and current

---

[1] SDCL § 2-14-13 provides, "[w]henever a statute appears in the code of laws enacted by § 2-16-13 which, from its title, text, or source note, appears to be a uniform law, it shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it."

spouses relating to a decedent's designation of a beneficiary for her retirement account. *Id.* at 109-110. Following the divorce, the account-holding spouse remarried but there was no change in the account's beneficiary designation of the former spouse. *Id.* at 109. Unlike the present case, there was no evidence indicating the decedent's specific intention regarding the beneficiary of the account after the divorce.

The former spouse's argument in <u>Buchholz</u> was simply that the deceased spouse's failure to change beneficiaries "indicates her intent to leave [the former spouse] as the beneficiary despite the couple's divorce." *Id.* at 112. This demonstration of "intent through inaction" argument was rejected by the court, noting that such an argument without further evidence would be vulnerable to "self-serving testimony regarding the decedent spouse's intent by inaction." *Id.*[2]

Under a set of facts entirely different and highly distinguishable from the present case, the South Dakota Supreme Court focused on the evidence (or lack thereof) in rendering its decision.

> Herein there is no showing Linda ever read the annual statements she received from SDRS. Her inaction does not equate with consent. Storsve fails in his burden under SDLC 29A-2-804 to show Linda's inaction rises to a clear indication of contrary intent to her decree of divorce from Storsve and its complete division of their marital assets. A policyholder's inaction is insufficient to circumvent application of SDCL 29A-2-804.

*Id.* at 112-113. The evidence of intent in the present case is greatly more than Pat's simple inaction in keeping Amy as the beneficiary under his American General life insurance policy. As both the deposition testimony and the sworn Affidavit of Hugh Boyle make clear, Pat met with Mr. Boyle and indicated on several occasions after the divorce that his intent was indeed that Amy remain the designated beneficiary. Among other reasons supporting this decision was

---

[2] Obviously the Court need not be concerned about a former spouse's "self-serving testimony" in this case, particularly given the clear and uncontroverted testimony of Hugh Boyle who served as both the Plaintiff's agent and Pat and Amy's financial advisor at all times relevant.

11

the fact that from all times after the divorce, Pat and Amy continued to share their marital residence and in all relevant respects functioned as a couple.

This is not a case about a spouse's failure to consider the issue, read and understand statements or other "inaction." This is a case involving clear expressions of intent not just to a former spouse but to the Plaintiff's agent himself following the divorce. Here, it is undisputed that Amy has presented evidence "ris[ing] to a clear indication of contrary intent[.]" *Id.* at 112.

It is apparent that the entire genesis and purpose of this statute is simply not applicable to divorcing couples in Pat and Amy's admittedly unusual circumstance and arrangement. As the supposed rationale for the statute, the South Dakota Supreme Court noted:

> The Uniform Probate Code provision on which [section 29A-2-804] is modeled derives from the recognition "that when spouses are sufficiently unhappy with each other that they obtain a divorce, neither is likely to want to transfer his or her property to the survivor on death." Revocation-upon-divorce statutes "reflect the legislative judgment that when the transferor leaves unaltered a will or trust or insurance beneficiary designation in favor of an ex-spouse, this failure to designate substitute takers more likely than not represents inattention rather than intention." Thus, [29A-2-804] attributes an intent to the donor based on an assessment of a typical donor's intention.

Buchholz v. Storsve, 740 NW2d 107, 111 (SD 2007)(quoting Stillman v. Teachers Ins. & Annuity Ass-n College Retirement Equities Fund, 343 Fed3d 1311, 1318 (10th Circuit 2003). Despite its holding, the South Dakota Supreme Court indicated that "[the] attribution of [intent to revoke upon divorce] is rebuttable" upon a "clear indication of contrary intent[.]" *Id.* at 111, 112.

Even a cursory review of the evidence in this case leads to the inescapable conclusion that the supposed justification for the statute would serve no purpose under these facts. As unusual as it may be for other divorcing couples, Pat plainly wanted and intended "to transfer his ... property to [Amy] on death." And rather than being a matter of "inattention," the evidence is

clear that the issue was specifically addressed and discussed on numerous occasions with Plaintiff's own agent. Despite and regardless of the divorce, Pat intended Amy to be the beneficiary of his life insurance policy, a sentiment about which Plaintiff is and was aware through its agent.

The Buchholz court relied upon and cited extensively the case of Stillman v. Teachers Ins. & Annuity Ass-n College Retirement Equities Fund, 343 Fed3d 1311 (10th Circuit 2003), a Tenth Circuit Court of Appeals case analyzing Utah's version of the Uniform Probate Code. Stillman involved a revocation statute in the context of competing claims to a decedent's annuity benefits. *Id.* at 1312. Although the exclusive issues in Stillman involve retroactive application of the statute at issue and constitutionality, the court addressed the issue of intent as part of its analysis on retroactivity:

> [I]n the law of donative transfers the modern approach is to give effect to what the donor intended, regardless of how precisely that intent was expressed in the operative document. The drafters of the 1990 revision to Article 2 of the Uniform Probate Code, upon which the 1998 Utah revisions are based, noted that the revisions were an attempt to respond to several developments in probate law, including "the decline of formalism in favor of intent-serving policies." Prefatory Note to Revised Article 2 Uniform Probate Code at 75 (1990). Thus, in the law of donative transfers, "rules of construction ... aid in determining and giving effect to the donor's intention or probable intention ...." Restatement (Third) of Property; Wills & Other Donative Transfers Section 7.2 cmt.a (2001); *See id.* Section 11.3 cmt.g ("in the absence of evidence that establishes by a preponderance of the evidence that the particular donor's intention differs from the common intention, ambiguities are resolved to the extent possible by construing the document to accord with common intention.").

Stillman, 343 F3d at 1317. In this case, there is certainly a "preponderance of evidence that [Patrick's] intention differs from common intention," and the statute should and must be read and construed to give effect to this undisputed record on the decedent's intent.

A closely analogous case to the present facts is that of State Farm Life Insurance Company v. Davis, 2008 WL 2326323 (D. Alaska 2008). In the Davis case, the insured

13

purchased life insurance in 1997 and named his then-wife as the beneficiary. *Id.* at 1. Those parties were divorced in 2003 and the insured died in 2007. *Id.* Unlike the present matter, where there are no contingent beneficiaries, the insured's children were named under the policy as successor beneficiaries. *Id.* A dispute arose between the ex-spouse and the children concerning the ex-spouse's status as the primary beneficiary under the policy given Alaska's version of the revocation-upon-divorce statute. In similar facts to the present matter, the decedent had expressed his intention to an employee of the insurance agency that his ex-spouse remain as the beneficiary after the divorce:

> Complicating what would otherwise be a straightforward application of this "revocation-upon-divorce" statute to John's designation of Jane as the beneficiary is the fact that after the divorce John told the employee of an insurance agency from whom he had purchased the State Farm policy that he continued to desire that Jane remain as the primary beneficiary.

*Id.* at 1.

The agent "had assisted John and Jane with several life insurance policies. In an affidavit, [the agent] acknowledged that because Jane was already named as the primary beneficiary in John's policy, [the agent] did not understand that anything else might need to be done to effectuate her status as the primary beneficiary." *Id.*

The court began its analysis by acknowledging that "the primary purpose of the Probate Code is to discover and make effective the intent of the decedent in distribution of the decedent's property." *Id.* at 2. In analyzing the particular statute, the federal court reviewed various jurisdictions and determined that the Alaska Supreme Court would confirm "the revocation-upon-divorce provision of the Alaska Probate Code created a rebuttable presumption, not a strict and inflexible rule." *Id.* at 4. "The Alaska court would do so in order to achieve the fundamental goal of honoring the decedent's actual intention." *Id.*

14

In the next step of the analysis, the court considered whether or not the named beneficiary had successfully rebutted the presumption of revocation with proof by a preponderance of the evidence that the deceased actually intended to designate the otherwise revoked beneficiary in spite of the divorce. Id. at 4.[3] The specific issue before the court on summary judgment was whether the insurance agent's affidavit testimony certifying the decedent's verbal designation of his ex-spouse established by a preponderance of the evidence that it was the decedent's intent to keep the former spouse as the primary beneficiary. *Id.* at 4. The court concluded that the single instance of expressed intent as testified to by the agent was indeed sufficient. *Id.* p. 5. The court noted that "the other parties had the chance to present contrary evidence and did not do so. The record discloses no other evidence of the [decedent's] intent." Under those facts, the designated beneficiary/former spouse was deemed to be entitled to the proceeds as a matter of law. *Id.*

The history and case law support the proposition that the revocation statute creates merely a presumption that may be overcome with evidence of a contrary intent, a burden plainly met by the Defendant in this case.

### 3. Any Presumption Of Revocation Upon Divorce Clearly Rebutted In This Case

Hugh Boyle and Amy Jenson have both testified by affidavit and deposition. The record is clear and straightforward and speaks directly to the issue of Patrick Jenson's intention regarding his designation of Amy as the beneficiary of his American General life insurance policy. There is no dispute, controversy or contrary evidence. The issue of intent as to the beneficiary designation following divorce was discussed with Pat at least twice. As Mr. Boyle testified, based upon his meetings with Patrick following the divorce, "there was never any

---

[3] The Davis court specifically framed the issue as, "to avoid a statutory imposition of the 'common intention,' there must be proof by a preponderance of the evidence that the deceased actually intended to designate the otherwise revoked beneficiary in spite of the divorce." Davis, at 4, (quoting Stillman, supra, 343 F3d at 1313).
15

question in my mind where he wanted the American General life insurance proceeds to go. From the initiation of the policy and continuing forward uninterrupted, it was [Patrick's] express intent that Amy be the beneficiary of the proceeds."

Perhaps Patrick and Amy's situation following their divorce was atypical. Although technically divorced, they continued to reside in the same household, raise their two children and function as a couple. Certainly they were working on issues which were troublesome in the relationship, but in all relevant respects treated each other as spouses. As Amy's affidavit and deposition testimony demonstrate, the evidence is consistent and compelling that Pat and Amy treated each other as spouses in terms of beneficiary status on their various accounts and policies. Under their unique circumstance, it was very natural and consistent that Amy would be the beneficiary of Pat's American General life insurance policy. More importantly for present purposes, Patrick expressly made this intention known to the agent who procured the American General policy. Any presumption of revocation is rebutted by the compelling and uncontroverted evidence presented herein, and as such, summary judgment is warranted.

4. Contract Exception Preserves Amy's Beneficiary Status

Although Defendant believes the issue of Pat's undisputed intent is dispositive and resolves the claim in Amy's favor, the same result is achieved by application of the statutory exceptions. As stated therein, SDCL § 29A-2-804 is inapplicable entirely where a contract exists between divorced individuals relating to beneficiary status. Specifically, any revocation brought about pursuant to the statute does not apply where the beneficiary status is addressed pursuant to "a contract relating to the division of the marital estate made between the divorced individuals before or after the marriage[.]" SDCL § 29A-2-804(b).

16

Following the divorce, Pat and Amy had an agreement regarding child care, household and other expenses. As stated above, and despite the divorce, Pat and Amy continued to reside in their marital home and function in all respects as a couple. Pat paid Amy $500 per month toward all of the household bills combined, which coincided with Pat's child support obligation pursuant to the parties' stipulation. The $500 per month was Pat's sole contribution to the family's household bills.

Included in this overall financial arrangement was an agreement regarding Amy paying the monthly premiums on Pat's life insurance policy, so long as she remained the designated beneficiary. This agreement continued from year to year upon the parties' annual meeting with financial advisor Hugh Boyle. It is undisputed that from the first issuance of Pat's life insurance policy, the monthly premium paid to the Plaintiff was taken by automatic withdrawal from Amy's separate checking account. After the divorce, Amy agreed to continue making these payments by automatic withdrawal, and Pat agreed that Amy remain the sole beneficiary under the policy. This agreement was confirmed at the annual meetings with Hugh Boyle, who knew and understood that the couple had divorced. Pat was well aware that Amy was paying the premiums on his life insurance policy and consented in all respects to the arrangement. After the divorce, Amy continued to make the monthly premium payments in the mount of $56.44, with total payments equaling $1,918.00. Certainly Amy would not have continued to make payments on Pat's policy if Pat did not agree to keep her as the beneficiary of said policy.[4]

---

[4] Clearly this is not a case where divorcing individuals simply disregarded or "forgot" to deal with the beneficiary designations on the life insurance policies the procured while married. As stated above, the issue was specifically addressed and a decision confirmed at least on a yearly basis following the divorce during Pat and Amy's meetings with Hugh Boyle. In fact, while the couple was divorcing, Amy changed the beneficiary designation on her policy to her mother (on behalf of the children), and later, well after the divorce was final, changed the beneficiary designation on her policy back to Pat. This history of agreements and specific actions on the policies taken after the divorce is compelling evidence against any revocation by operation of law.

17

In South Dakota, a contract is either express or implied. SDCL § 53-1-3. An express contract has its terms stated in words, whereas the terms of an implied contract are manifested by conduct. *Id.* An express contract can be either written or oral. In Re: Estate Of Neiswender, 616 NW2d 83 (SD 2000). An express contract results when parties mutually express intent to be bound by specific terms and conditions. Werner v. Northwest Bank South Dakota, NA, 499 NW2d 138, 141 (SD 1993). In order to create a contract, four elements must exist: 1) the parties must be capable of contacting; 2) they must consent; 3) the purpose for contracting must be lawful; 4) there must be sufficient cause or consideration. Setliff v. Akins, 616 NW2d 878, 888 (SD 2000, citing SDLC § 53-1-2). All of the elements for both and express and implied contract are present in this case.

In this case, an express contract existed between Amy and Pat on the issue of Pat's life insurance. On at least two occasions following the divorce, Pat expressed his intent and agreement that Amy remain the beneficiary of his life insurance policy. Amy on these same occasions confirmed her agreement to continue to make the premium payments on Pat's policy pursuant to the automatic withdrawal from her separate checking account. As such, the existence of a contract or agreement between Pat and Amy after the marriage serves to nullify any effect SDCL § 29A-2-804 would otherwise have.

Alternatively, an implied contract existed between Pat and Amy regarding Amy's payment of the premiums and her remaining as sole beneficiary on the policy. Of course there is no distinction in the legal effect between an express contract and implied contract. St. John's First Lutheran Church of Milbank v. Storsteen, 84 NW2d 725, 727 (SD 1957).

> An implied contract is a true contract and must contain all the elements of an express contract. The distinction between them is in the way in which mutual assent is manifested. In an express contract the terms are stated by the parties. In an implied contract they are inferred from the circumstances.

*Id.*

Although it is clear that in the context of the various meetings between the parties and their financial advisor, an express contract was created regarding Pat's life insurance policy, it is apparent as an alternative that the existence and terms of their contract were manifested by their conduct following the divorce. That is, following the divorce, Amy continued to make the premium payments on Pat's life insurance policy as part of the agreement that she remain the beneficiary on the policy. Following the divorce, Amy paid $1,918 towards the policy premium up until Pat's passing. Certainly Amy would not have continued making the premium payments ($56.44 per month) during the several years following the divorce if Pat would have changed the beneficiary to a parent, sibling or other person or entity.

## CONCLUSION

It is respectfully submitted that because of the clear, compelling and undisputed evidence regarding Pat's intent as to the beneficiary, SDLC § 29A-2-804 serves as no impediment to the immediate distribution of the proceeds to Amy. In the alternative, it is equally clear that the contract exception set forth within the statute serves to mandate the same result. Either way, there are no genuine issues of material fact and summary judgment in favor of the Defendant is proper. Defendant respectfully requests that her motion be granted and that the Court order the Plaintiff to pay the proceeds at issue, plus interest, to the Defendant with all due haste.

Respectfully submitted this 3rd day of November, 2011.

                              CLAYBORNE, LOOS & SABERS, LLP

*Electronically signed*

                    /s/
                Michael C. Loos
                Attorneys for Defendant Amy Jenson
                2834 Jackson Blvd., Suite 201
                P.O. Box 9129
                Rapid City, SD  57709

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he served a true and correct copy of the foregoing *Memorandum In Support Of Defendant's Motion For Summary Judgment* upon the person herein next named, on the date shown below, by electronic service:

J. Crisman Palmer
GUNDERSON, PALMER, NELSON & ASHMORE
440 Mt. Rushmore Road, 3rd Floor
P.O. Box 8045
Rapid city, SD  57709
Attorneys for Plaintiff
cpalmer@gpnalaw.com

and that such address is the last address of the addressee known to the subscriber.

Dated this 3rd day of November, 2011.

                    /s/
                Michael C. Loos