Exhibit 2 A

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

---

AMERICAN GENERAL LIFE
INSURANCE COMPANY,                )      File Number 11-5057
                                  )
                                  )      Deposition of:
            Plaintiff,            )
                                  )        HUGH BOYLE
vs.                               )
                                  )
AMY JENSON,                       )
                                  )
            Defendant.            )      COPY
                                  )

---

        DATE:       September 12, 2011, at 1:30 p.m.

        PLACE:      Clayborne, Loos & Sabers
                    3834 Jackson Boulevard, Suite 201
                    Rapid City, South Dakota

APPEARANCES:

    FOR THE PLAINTIFF:        MR. J. CRISMAN PALMER
                              Gunderson, Palmer, Nelson & Ashmore
                              Attorneys at Law
                              440 Mt. Rushmore Road
                              Rapid City, SD  57701

    FOR THE DEFENDANT:        MR. MICHAEL C. LOOS
                              Clayborne, Loos & Sabers
                              Attorneys at Law
                              3834 Jackson Boulevard, Suite 201
                              Rapid City, SD  57702


Also Present:  Amy Jenson

| | | |
|---|---|---|
| 1 | | (Exhibit Numbers 1 and 2 marked for |
| 2 | | identification.) |
| 3 | | HUGH BOYLE, |
| 4 | called as a witness, being first duly sworn, testified as |
| 5 | follows: |
| 6 | EXAMINATION BY MR. PALMER: |
| 7 | Q | Good afternoon. |
| 8 | A | Hi, Cris. |
| 9 | Q | How would you like me to address you? Can I call you |
| 10 | | Hugh? |
| 11 | A | Hugh. That would be fine. |
| 12 | Q | Okay. Would you please tell us your name and |
| 13 | | business address, please. |
| 14 | A | Hugh Boyle. 1508 Mountain View Road, Suite 101, |
| 15 | | Rapid City, South Dakota 57702. |
| 16 | Q | And have you had your deposition taken before, Hugh? |
| 17 | A | No. |
| 18 | Q | Okay. I'm sure that Mike has talked to you about |
| 19 | | this. But I'm going to ask you some questions. I |
| 20 | | need you to answer out loud audibly so that Carolyn |
| 21 | | can take down what's said. We all in today's |
| 22 | | conversation use a lot of shakes of the head and |
| 23 | | uh-huhs and things of that nature. So we need to say |
| 24 | | yes and no. Okay? |
| 25 | A | Yes. You couldn't hear my head rattle? |

| | | |
|---|---|---|
| 1 | Q | If I ask a question that you don't understand, just |
| 2 | | let me know. Because I'm going to assume if you |
| 3 | | answer a question that you understood it. Fair |
| 4 | | enough? |
| 5 | A | Fair enough. |
| 6 | Q | Okay. What's your employment? |
| 7 | A | I work for myself. |
| 8 | Q | Okay. What do you do for a living? |
| 9 | A | I'm a registered investment advisor. I own BMS |
| 10 | | Financial Advisors with my partner Doug Maher. |
| 11 | Q | I have a sense of what you do, but can you generally |
| 12 | | tell me what you do and what services you provide to |
| 13 | | your clients? |
| 14 | A | I help people plan for their future, retirement |
| 15 | | protection. |
| 16 | Q | I take it you sell life insurance? |
| 17 | A | Yes. |
| 18 | Q | Do you sell property casualty? |
| 19 | A | I do not. |
| 20 | Q | Okay. Are you licensed to sell securities? |
| 21 | A | Yes. |
| 22 | Q | And what license do you work with? |
| 23 | A | 7, 63, 65, 24, 51. I think that's all the numbers. |
| 24 | Q | I understand. I understand. Tell me a little bit |
| 25 | | about your educational background. |

| | | |
|---|---|---|
| 1 | A | In 1979 I graduated from the School of Mines. Then I |
| 2 | | start taking CFP classes in 1980. And then in '86 I |
| 3 | | moved to Rapid City. And education from there has |
| 4 | | just been in the financial planning industry. |
| 5 | Q | And when you came to Rapid City in '86, where were |
| 6 | | you employed? |
| 7 | A | In '86, I bought a store out in the Rushmore Mall. |
| 8 | Q | What store was that, Hugh? |
| 9 | A | Cones & Corn. |
| 10 | Q | Okay. Okay. And when did you go full time into the |
| 11 | | investment business, if I may use that term? |
| 12 | A | Yeah. It was kind of a seg -- gradual segue. In |
| 13 | | '95, started in the insurance side with fixed |
| 14 | | annuities and life insurance and I was helping other |
| 15 | | producers so I wasn't doing it myself. And then '98 |
| 16 | | I started doing it myself. |
| 17 | Q | In that '95 to '98 period, were you employed by |
| 18 | | someone other than yourself? |
| 19 | A | Had a company called Diversified Consulting. But |
| 20 | | that was -- I own that as well. |
| 21 | Q | Okay. What did that business do? |
| 22 | A | We would visit with producers and then we'd send |
| 23 | | their name up to a brokerage house in Minneapolis and |
| 24 | | then they would help them with the products. So I |
| 25 | | would help the producer on the business side, they |

| | | |
|---|---|---|
| 1 | | would help them with the products. |
| 2 | Q | Okay. And this was -- was this related to financial |
| 3 | | and insurance products? |
| 4 | A | You know, it was life insurance and fixed annuities. |
| 5 | | Primarily fixed annuities. |
| 6 | Q | Okay. Well, we're here today to talk about a policy |
| 7 | | of insurance on Patrick Jenson. You're familiar with |
| 8 | | that? |
| 9 | A | Yes. |
| 10 | Q | Tell me how you became acquainted with Patrick and |
| 11 | | Amy Jenson. |
| 12 | A | In 2002, we met to go over, you know, their |
| 13 | | situation. Amy worked at the hospital so we |
| 14 | | discussed the 403(b) and just other needs as they |
| 15 | | arose. |
| 16 | Q | If you remember, how did they come to seek out |
| 17 | | counseling from you, Hugh? |
| 18 | | THE WITNESS: Was it a referral? |
| 19 | | MS. JENSON: You had one of those seminars. |
| 20 | A | Oh, I had a seminar. Okay. We put on public |
| 21 | | educational seminars and Amy and Patrick attended one |
| 22 | | of those. |
| 23 | Q | And you think the first time that you saw them was |
| 24 | | 2002? I'm not suggesting it. I'm just trying to |
| 25 | | make sure I've got a fix in time. |

1   A   In 2002 were my first notes that we had on...
2   Q   And so they came to talk --
3   A   On the --
4   Q   I'm sorry.
5   A   On the meeting.
6   Q   Okay.
7   A   Yeah.
8   Q   And they came to talk to you generally about
9       financial planning and the future --
10  A   Right.
11  Q   -- and stuff like that?
12  A   Um-hmm.
13  Q   Okay. Tell me what you recall about what you
14      provided to them by way of a product from the time
15      they first saw you until Mr. Jenson's death, as best
16      you recall?
17  A   Well, we reviewed Amy's 403(b). Patrick at that time
18      had a 401(k). And then when Patrick stopped working
19      at the place with his 401(k), we rolled over his
20      401(k) to an IRA at our firm. We helped Amy with her
21      403(b) at the hospital. So then upon their divorce,
22      half of Pat's IRA went to Amy. And so then we
23      managed both of those accounts for them. And we also
24      set up an educational 529 plan for Jed.
25  Q   Okay. When did you first sell them any life

1       insurance products?
2   A   Well, we started discussing it for a long time. And,
3       finally, in April of 2006, we delivered both
4       policies. Amy bought one and Patrick bought one.
5   Q   I take it from the way you answered that, Hugh, that
6       for some period of time you would have been
7       discussing life insurance issues with them?
8   A   Um-hmm.
9   Q   Is that yes?
10  A   Yes.
11  Q   Okay. And -- I know. Believe me. Carolyn --
12  A   Sorry about that.
13  Q   Carolyn can tell you a million stories, so... We all
14      do it. Don't worry about it.
15          The first life insurance product you remember
16      selling Amy and Patrick was the policies, the subject
17      of what we're talking about today?
18  A   That's correct.
19  Q   Okay. In the materials that I received from my
20      client, they kind of came in a packet that was sort
21      of two-fold. So I marked them as Exhibits 1 and 2.
22      I'm going to let you tell me if they all belong
23      together or not. I'm going to show you what I've
24      marked as Exhibit 1, which had a covered sheet
25      addressed to you. I was going to ask you if you

1       could look at that exhibit. That's part of that
2       policy I provided Mike. I just wanted to know if you
3       could identify that for me?
4           (A brief pause.)
5   A   Yes. This is Patrick's American General Policy and
6       the delivery requirement --
7   Q   Is that --
8   A   -- page.
9   Q   -- an actual -- do you consider that to be an actual
10      part of the policy, Hugh?
11  A   It's part of the delivery requirements of the policy.
12  Q   Okay. Tell me what you mean?
13  A   Technically, part of the policy -- the policy itself
14      has everything in there, but they like to have this
15      information given to the purchaser because it gives
16      them an idea of the -- you know, the South Dakota
17      reinsurance policy and then the privacy notices.
18  Q   Okay. Let's just try to make this clean --
19  A   Okay.
20  Q   -- because there's nothing magical here. This is
21      Exhibit 2 that I've had marked for identification,
22      Hugh. Is that the actual policy-policy?
23          (A pause.)
24  Q   And I would represent to you obviously that's a
25      photocopy.

1   A   Right. It's a duplicate.
2   Q   Right.
3   A   But yes.
4   Q   Okay. So Exhibit 2 is the policy of insurance that
5       would have been on Mr. Jenson's life. And Exhibit 1
6       is when you deliver the policy to your customer,
7       that's -- or your client, that's some of the
8       materials you provide them?
9   A   Correct.
10  Q   Okay. So when we're looking at the universe of
11      documents that we talk about, the policy on
12      Mr. Jenson's life, we have the actual policy and the
13      delivery documents. Anything else? I suppose an
14      application out there, too?
15  A   Well, an application is in the policy.
16  Q   Okay.
17  A   So in the back of that there is their application.
18  Q   I did see that. Okay. Thank you. So there's no
19      other documents we should be looking at in
20      relationship to this issue that you're aware of?
21  A   That I'm aware of, no.
22  Q   Okay. Tell me what you remember about the specific
23      discussions, as best you can recall them, that led up
24      to their purchasing this life insurance policy and in
25      this amount?

Carolyn M. Harkins, RPR (605)348-7168
P.O. Box 1886, Rapid City, SD 57709

1 A The discussion was trying to replace Patrick's income
2 and giving Amy enough to say, okay, without that
3 income, can she take care of the kids and have enough
4 money to replace his income?
5 Q Okay.
6 A So I would say income replacement is what I used to
7 determine the amount.
8 Q Okay. There was also life insurance purchased on
9 Amy's life --
10 A That's correct.
11 Q -- a policy? Okay. Was it in the same face amount,
12 500,000?
13 A Yeah.
14 Q Okay. So application was made, it was approved, the
15 policy was issued, and pursuant to Exhibit 1, you
16 delivered the policy to Mr. Jenson?
17 A Correct.
18 Q Okay. Do you remember having any specific
19 conversations about the policy when you delivered it
20 other than going through the delivery stuff you
21 provided?
22 A No.
23 Q I realize it's a while ago.
24 A No.
25 Q Okay. At some point in time, I take it you became

1 aware that Mr. and Mrs. Jenson either were going to
2 divorce or had divorced. Maybe you can help me how
3 you became aware of that?
4 A Had divorced.
5 Q Okay. Tell me how you became aware of that
6 information.
7 A Amy shared that with me.
8 Q Okay. Did she call you to say, Patrick and I are now
9 divorced? What do I need to do? I'm just trying to
10 get a feel, Hugh, for how that went down.
11 A Yeah. Basically, that. And wanted to change the
12 beneficiaries.
13 Q Okay. Amy wanted to change the beneficiary on her
14 policy?
15 A On her policy, yes.
16 Q And she changed it from whom to whom or from who to
17 who or whatever is proper?
18 A I'm going to have to look back on that.
19 THE WITNESS: Do we have that here?
20 Q If you don't remember right now, that's fine. You
21 remember that she was --
22 A She changed it, yes.
23 Q Okay. Did you have any conversation with Mr. Jenson
24 about changing his beneficiary at that time?
25 A Had a conversation he never wanted to change his.

1 Q Okay.
2 A Or I should say he, at that time, didn't want to
3 change it.
4 Q Okay. He had named Amy as his beneficiary?
5 A Correct.
6 Q Tell me what you recall, as best you can recall, of
7 the content of that conversation with Mr. Jenson.
8 A The conversation was, if you want to change your
9 beneficiary, you can do that. He wanted to leave Amy
10 as the primary beneficiary on his policy with the
11 kids' contingent. At that time I guess it was Jed as
12 contingent.
13 Q Did you call him to talk about it? Did he call you?
14 What was the instigation, as best you recall?
15 A It was probably brought up in a meeting that I had
16 with Pat.
17 Q So at some point in time Mr. Jenson came in to see
18 you to discuss financial issues?
19 A Pat came in one time to talk about the IR -- his IRA
20 because he wanted to take the money out of that.
21 Q Okay. And was it in that conversation discussing the
22 IRA that you talked about the life insurance policy?
23 A That's where he wanted to keep it the same.
24 Q Okay. Did you ask him if he wanted to change it or
25 did he just say, I don't want to? What do you recall

1 about that, Hugh?
2 A Patrick said he wanted the money to go to Amy, yes.
3 So that didn't change --
4 Q Okay. How did --
5 A -- just because...
6 Q How did the subject of the life insurance policy come
7 up in the course of discussing the IRA?
8 A Well, I tried to talk about everything that they
9 have, so it would just be an agenda item.
10 Q Okay. I believe earlier in our conversation you said
11 that in the course of the divorce or as a result of
12 the divorce that the IRA was divided in half?
13 A Split. That's correct.
14 Q Okay. When Mr. Jenson came in to talk to you about
15 cashing out the IRA, had it been split in half at
16 that time?
17 A Yes.
18 Q Okay. And he advised -- Mr. Jenson, and he,
19 Mr. Jenson, advised you he wanted to leave Amy as the
20 beneficiary on the policy even though they had since
21 divorced?
22 A Correct.
23 Q Okay. After that meeting, did you have any further
24 conversations with Mr. Jenson about that life
25 insurance policy or the beneficiaries?

1  A   I have to look back, but I think Amy, Patrick and I
2      met and brought it up again. He didn't want to
3      change it. So I believe there is one other meeting
4      after that IRA meeting.
5  Q   Okay. And was it in the same general time frame,
6      Hugh, that Amy changed her beneficiary or was that
7      before or after Mr. Jenson did, if you recall?
8  A   State that again.
9  Q   Sure. It wasn't a very artful question. When do you
10      remember Amy Jenson advising you she wanted to change
11      her beneficiary relative to when Mr. Jenson said he
12      did not, before or after?
13  A   Patrick's was after.
14  Q   Okay. When Mrs. Jenson decided to change her
15      beneficiary, did you have any discussion with her
16      about whether she and Mr. Jenson were continuing to
17      live together even though they were divorced?
18  A   Yeah. We were using the same address to send the
19      statements to.
20  Q   Okay.
21  A   And the premiums were still coming out of Amy's
22      checking account.
23  Q   I understand and I appreciate that. But do you
24      recall any conversation where you discussed that with
25      either -- with Amy? Let's leave it at that for the

1      moment. Other than the fact they were using the same
2      address and the premium was coming out of her
3      account, did you have a discussion with her about
4      we're divorced, but we're continuing to live
5      together, or anything like that did you discuss with
6      Mrs. Jenson?
7  A   Yes.
8  Q   Okay. Tell me what you remember about that.
9  A   They were divorced and living together.
10  Q   Okay. To your knowledge, did they ever live apart?
11  A   Not to my knowledge.
12  Q   Understood. How about Mr. Jenson, did you have any
13      similar conversation with him?
14  A   I did not.
15  Q   And you do recall, as best you can, that there was
16      another meeting later after that where you discussed
17      financial insurance issues with Mr. and Mrs. Jenson?
18  A   Um-hmm.
19  Q   Is that yes?
20  A   Yes.
21  Q   Tell me what you remember about that meeting, as best
22      you can.
23  A   That meeting was more of a general, you know, here's
24      where we are, here's what's going on, and we may get
25      back together in terms of marriage.

1  Q   Do you recall having any specific discussions? I'm
2      just trying to find out what discussions were or
3      weren't had.
4  A   Sure.
5  Q   Whether there were any specific discussions at that
6      second time about any beneficiary changes or any
7      beneficiaries remaining the same or anything like
8      that?
9  A   Beneficiaries were to stay the same.
10  Q   At some point in the time did I see that Mrs. Jenson
11      changed her beneficiary back to Patrick?
12      (A pause.)
13  Q   I think --
14  A   Yes. On June 21st, 2010 -- I was just looking for a
15      date here. She changed the policy to Pat with Jed
16      and Chloe as contingent beneficiaries.
17  Q   Okay. Did you have a -- I don't know how else but to
18      say set appointments, probably not chiseled in stone,
19      did you meet annually with the Jensons?
20  A   Tried to, yeah.
21  Q   Okay. Would those appointments be generated by you
22      following up with them or them following up with you
23      or how did that generally work?
24  A   Usually my office would call and set an appointment.
25  Q   Okay. I think that -- it looks to me, at least from

1      the materials I've seen, Hugh, that sometime in March
2      of 2010 is at least when Mrs. Jenson asked you to
3      process that change of beneficiary. Did you have any
4      -- do you remember meeting with either one of them
5      individually or jointly after March of 2010?
6  A   Meeting, no. Amy would have had to sign the
7      beneficiary form.
8  Q   Sure.
9  A   But I wouldn't call that an official meeting.
10  Q   Okay. And did you tell me -- and I'm sorry if you
11      already have told me this. But was a check written
12      monthly for the premium or annually for the premium
13      or just come out of an account, an automatic
14      withdrawal?
15  A   An automatic withdrawal out of Amy's account. Amy's
16      checking account.
17  Q   Okay. To your knowledge did Mr. and Mrs. Jenson
18      maintain a joint checking account or did they have
19      separate checking accounts, if you know?
20  A   I don't know.
21  Q   Okay. Other than a business relationship, did you
22      have a social relationship with the Jensons at any
23      level? I mean, I understand you get to know your
24      clients. But on a true social --
25  A   No.

1　Q　Okay. When did you become aware of the issue that
2　　　arose about paying the benefits with the divorce and
3　　　the issues being raised by the insurance company
4　　　regarding payment of the proceeds of this policy?
5　A　After we sent the claim in.
6　Q　Okay. Were you aware of that statute that comes out
7　　　of the Uniform Probate Code that deals with that
8　　　divorce issue and presumptions regarding life
9　　　insurance before that? I know you certainly are now.
10　A　No.
11　Q　You don't have to be sheepish about it. There's a
12　　　lot of us that wouldn't know that. Had you ever had
13　　　that situation come up before where they -- people
14　　　are divorced and maintain one another's life
15　　　insurance beneficiaries other than as might be
16　　　court-ordered?
17　A　Yeah. I had not.
18　Q　Okay. Do you know, in the course of your dealing
19　　　with the Jensons and advising them, did they have
20　　　wills?
21　A　I tried to encourage that. I don't know if they ever
22　　　got that done.
23　Q　Okay. Just so that I know for the record, does
24　　　Mrs. Jenson still maintain a life insurance policy on
25　　　her life that you sold her?

1　A　Yes.
2　Q　In the material that I was provided, there's an
3　　　affidavit of Hugh Boyle. Did you prepare that
4　　　affidavit?
5　A　Yes.
6　Q　You kind of looked at Mike. There's nothing about
7　　　this that's sinister. I'm just trying to understand.
8　　　I presume you gave him the information. Did Mike's
9　　　office actually prepare the written document itself?
10　A　Yeah.
11　Q　Okay. And you would have had a meeting with Mike to
12　　　discuss that --
13　A　Yes.
14　Q　-- and give him this information that's contained in
15　　　your affidavit?
16　A　Um-hmm. Yes.
17　Q　Have you had any conversations with any of the
18　　　representatives of the insurance company whether it
19　　　might be somebody adjusting the claim or somebody at
20　　　the home office or have you discussed it with anybody
21　　　from the company?
22　A　Not directly with the company, I have not. We go
23　　　through a brokerage, Midwest Financial, and I've
24　　　asked them to do that.
25　Q　What is Midwest Financial?

1　A　They're a brokerage. They represent many different
2　　　life insurance companies.
3　Q　Are they like a general agent or they're just a
4　　　broker.
5　A　Just a broker.
6　Q　Okay. Where are they located?
7　A　Michigan.
8　Q　And who, in particular, did you talk to at Midwest
9　　　Financial about that issue?
10　A　Andrea Liberman.
11　Q　And how did it happen that you talked to Andrea as
12　　　opposed to somebody else, if you know?
13　A　Well, she's the one I go through to get the policies.
14　Q　Okay. Where in Michigan is Midwest Financial?
15　A　I'll have to get back to you on that.
16　Q　That's fine.
17　A　I don't know the address.
18　Q　Okay. And what did -- you talked to Andrea. Did she
19　　　do some research and get back to you or tell me what
20　　　came of that conversation?
21　A　What came of that conversation, basically, was
22　　　American General was saying it was written to Amy
23　　　Jenson, spouse. So they weren't looking at the
24　　　intent of Patrick's side. They were just going by
25　　　the letter of the law and it said Amy Jenson, spouse,

1　　　and Amy Jenson wasn't the spouse. They didn't know
2　　　anything about them living together or what Patrick's
3　　　intention was.
4　Q　Okay. And was that -- in short, that was what Andrea
5　　　Liberman told you came from the company?
6　A　Correct.
7　Q　All right. And after contacting Andrea Liberman and
8　　　then her following back up with you, did you have any
9　　　further conversations with her or anyone else at
10　　　Midwest Financial regarding the situation?
11　A　No.
12　Q　Okay. Were you ever contacted by any claims person
13　　　or someone claiming to be a representative of the
14　　　insurance company regarding this?
15　A　No.
16　Q　Did you ever have occasion to see the decree of
17　　　divorce or the findings of fact, conclusions of law,
18　　　or whatever might have come out of divorce to see
19　　　what the requirements were?
20　A　I don't recall.
21　Q　Okay. You just knew that somewhere along the line
22　　　that you were supposed to divide the IRA and you went
23　　　through whatever that process is?
24　A　We may have needed a copy of that divorce decree for
25　　　that. That's why I...

Carolyn M. Harkins, RPR (605)348-7188
P.O. Box 1888, Rapid City, SD 57709

| | | |
|---|---|---|
| 1 | Q | Yeah. I don't know what it is myself, but I know |
| 2 | | there's something that's -- |
| 3 | A | We have to show them the Quadro. |
| 4 | Q | Yeah. There you go. Did you ever have any question |
| 5 | | in your mind that Patrick was of sound mind and knew |
| 6 | | what he was doing when he said he wanted to leave Amy |
| 7 | | as the beneficiary? |
| 8 | A | There was no question in my mind. |
| 9 | | MR. PALMER: That's all I have. Thank you. |
| 10 | | MR. LOOS: I just have a couple follow-up here, |
| 11 | | Hugh. |
| 12 | | MR. PALMER: Sure. |
| 13 | | EXAMINATION BY MR. LOOS: |
| 14 | Q | On Exhibit 2 -- |
| 15 | | MR. LOOS: If you want to look on, Cris. |
| 16 | | MR. PALMER: Sure. |
| 17 | | MR. LOOS: I'll try just to be as clear as I can. |
| 18 | Q | So, as I understand it, Hugh, the application itself |
| 19 | | is attached to Exhibit 2 and made part of the policy? |
| 20 | A | Correct. |
| 21 | Q | Okay. And then for the beneficiary information, |
| 22 | | that's part of the application and it's a part of the |
| 23 | | form that has a name and then a relationship at the |
| 24 | | time of the application. Is that how it's laid out? |
| 25 | | Do you follow me? |

| | | |
|---|---|---|
| 1 | A | Um-hmm. |
| 2 | Q | Okay. So in Patrick's application for the name |
| 3 | | section for the beneficiary, he listed Amy Jenson, |
| 4 | | correct? |
| 5 | A | Um-hmm. Yes. |
| 6 | Q | And then the relationship of Amy Jenson at the time |
| 7 | | he signed the application was that of spouse, right? |
| 8 | A | Correct. |
| 9 | Q | And then what was the percentage of the beneficiary? |
| 10 | A | 100 percent. |
| 11 | Q | Okay. So you may have testified earlier that there |
| 12 | | was a contingent beneficiary. Having reviewed this |
| 13 | | document, does it appear that Patrick had a |
| 14 | | contingent beneficiary for his American General |
| 15 | | policy? |
| 16 | A | No. |
| 17 | Q | Okay. One of the questions that Mr. Palmer asked |
| 18 | | involved the second meeting that you would have had |
| 19 | | to discuss the issue of Pat's intent regarding Amy |
| 20 | | being designated the beneficiary of the life |
| 21 | | insurance. And I believe the question was, Did the |
| 22 | | topic of Pat's beneficiary designation come up at |
| 23 | | this meeting? And the record will indicate what you |
| 24 | | answered. My notes said you answered that they |
| 25 | | stayed the same. So I just want to make sure the |

| | | |
|---|---|---|
| 1 | | record is clear. At the second meeting, was the |
| 2 | | topic of the beneficiary designation, was it |
| 3 | | discussed as one of the agenda items? |
| 4 | A | Yes. |
| 5 | Q | Okay. And the result of that discussion was what? |
| 6 | A | Patrick wanted to leave the beneficiary the way it |
| 7 | | was. |
| 8 | | MR. LOOS: Okay. That's all I've got, Cris. |
| 9 | | MR. PALMER: Thanks. Real quick, just so that I |
| 10 | | know. |
| 11 | | FURTHER EXAMINATION BY MR. PALMER: |
| 12 | Q | On the application that's part of Exhibit 2, is that |
| 13 | | filled out in the insured's own handwriting or do you |
| 14 | | fill that out? |
| 15 | A | I fill that out. |
| 16 | Q | Okay. So you sit down with the client and ask the |
| 17 | | questions and then you fill out the application and |
| 18 | | they sign? |
| 19 | A | Correct. |
| 20 | | MR. PALMER: Okay. That's all I have. |
| 21 | | MR. LOOS: That's all. You've got a right to |
| 22 | | read the transcript of your deposition before it |
| 23 | | becomes a part of the permanent record, Hugh, or you |
| 24 | | can waive that right. You just need to indicate to |
| 25 | | our court reporter whether you would like to read or |

| | | |
|---|---|---|
| 1 | | whether your preference is to waive. |
| 2 | | THE WITNESS: I'd like to read it. |
| 3 | | MR. LOOS: Fair enough. |
| 4 | | (Whereupon the deposition concluded at 2:10 p.m.) |

```
 1              DEPONENT'S SIGNATURE PAGE
 2      I, Hugh Boyle, the undersigned deponent, have this _____
 3   day of _____, 2011, read the forgoing pages 1 through
 4   26, inclusive, have made the following change(s) (if any) to
 5   said testimony, have stated my reason(s) for each change or
 6   correction, and have signed below.
```

 7              _____
                    Hugh Boyle
 8   Changes/Corrections

 9   Page  Line  Desired change and reason therefore:

10   ___  ___  _____

11   ___  ___  _____

12   ___  ___  _____

13   ___  ___  _____

14   ___  ___  _____

15   ___  ___  _____

16   ___  ___  _____

17   ___  ___  _____

18   ___  ___  _____

19   ___  ___  _____

20   ___  ___  _____

21   ___  ___  _____

22   ___  ___  _____

23   ___  ___  _____

24   ___  ___  _____

25   (Use a separate sheet similarly designated for additional
     changes, with signature of deponent on each sheet.)

 1   STATE OF SOUTH DAKOTA )

 2              ) SS.          CERTIFICATE

 3   COUNTY OF PENNINGTON )

 4

 5      I, CAROLYN M. HARKINS, Court Reporter and Notary Public,
 6   South Dakota, duly commissioned to administer oaths, certify
 7   that I placed the witness under oath before the witness
 8   testified; that the foregoing testimony of said witness was
 9   taken by me in shorthand, and that the same has been reduced to
10   typewritten form under my supervision; that the foregoing
11   transcript is a true and correct transcript of the questions
12   asked, of the testimony given, and of the proceedings had.
13      I further certify that I am not related to, employed by, or
14   in any way associated with any of the parties to this action,
15   or their counsel, and have no interest in its event.
16      Witness my hand and seal at Rapid City, South Dakota, this
17   18th day of September, 2011.
18
19
20              _____
                Carolyn M. Harkins, RPR
21              Registered Professional Reporter

22
     My Commission Expires:  11-24-2015
23
24
25