UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| AMERICAN GENERAL LIFE INSURANCE COMPANY, | ) ) ) | CIV. 11-5057-JLV |
| Plaintiff, | ) ) | |
| vs. | ) ) | **REPORT AND RECOMMENDATION** |
| AMY JENSON, | ) ) | |
| Defendant. | ) | |

## INTRODUCTION

This matter is before the court on a complaint filed by plaintiff American General Life Insurance Company ("American General") interpleading the funds from a life insurance policy on decedent Patrick M. Jenson with the court and seeking a declaration from the court as to who is entitled to those policy proceeds. Jurisdiction is premised on diverse citizenship of the parties and an amount in controversy in excess of $75,000. See 28 U.S.C. § 1332. Defendant Amy Jenson, Patrick's ex-wife, is the only party to make an appearance and assert a claim to the life insurance proceeds. She now moves for the entry of summary judgment in her favor on undisputed facts. See Docket No. 15. The district court, the Honorable Jeffrey L. Viken, referred Ms. Jenson's motion to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

## FACTS

The facts upon which Ms. Jenson bases her motion are entirely undisputed by American General.  As such, the following is a recitation of the facts taken from Ms. Jenson's statement of undisputed facts found at Docket No. 17.  Additional facts have been added from the depositions of Ms. Jenson and Hugh Boyle and from the life insurance policy at issue.

Amy Jenson and Patrick Jenson were married in South Dakota on July 5, 2003, after having dated for 15 years.  They lived together in Rapid City, South Dakota.  They had a son in 2004 and a daughter in 2006.  Those children are still minors today.  Amy and Patrick each had their own, separate checking account.  They never maintained a joint checking account for household expenses.[1]

In 2002, before their marriage, Pat and Amy met Hugh Boyle of BMS Financial Advisors in Rapid City.  Mr. Boyle provided estate planning services, selling life insurance and securities.  He had his series 7, 63, 65, 24, and 51 licenses.  As part of his overall estate planning advice, Mr. Boyle recommended that Pat and Amy purchase life insurance for themselves.  In 2006, the Jensons, now husband and wife, followed Mr. Boyle's advice, purchasing policies from American General through Mr. Boyle.

_____

[1]The Jensons did have one joint account that was used solely to pay expenses for a cabin that the Jensons owned jointly with Patrick's parents.

2

On May 18, 2006, American General issued to Patrick Jenson a "20 year renewable level benefit term life insurance" policy in the amount of $500,000. See Docket No. 20-1, page 4. Under the terms of the policy, Patrick was required to pay an annual premium in the amount of $645.00 (which was broken down into 12 equal installments that were billed and paid monthly), and American General agreed to pay $500,000 upon Patrick's death. American General promised to keep the premium payment the same for the first 20 years of the policy, after which American General reserved the right to change the premium. Amy was named as the beneficiary on Patrick's policy. See Docket No. 26-1, page 11.

The policy says nothing about the effect of divorce upon one's designation of beneficiary, although the policy and accompanying materials make specific references to other provisions of South Dakota law, as well as specific provisions of California, New Mexico and Vermont law. See Docket No. 20-1 at pages 5, 12-13. The policy provisions state that the owner may change the beneficiary by written notice to American General. See Docket No. 26-1, page 2. The policy states that the beneficiary remains as stated in the policy unless the owner changes it. Id. The policy states that its terms may not be changed except in writing by an officer authorized to make such changes. Id. Mr. Boyle never told the Jensons about any change in beneficiary by operation

3

of law after a divorce because, quite simply, he himself was unaware of any such possibility.

A mirror-image American General policy in the same amount insuring Amy's life was issued.  Amy's policy named Patrick as the beneficiary. Throughout the life of Patrick's American General life insurance policy, Amy paid the premiums on the policy out of her personal, separate checking account via direct electronic funds transfer.  She never missed any premium payment at any time.  Patrick's life insurance policy did not list any contingent beneficiary other than Amy.  Id. The couple met annually with Mr. Boyle to review their financial circumstances.

Patrick developed a problem with alcohol that became an issue in the Jensons' marriage.  Amy wanted Patrick to seek help for his alcohol problem. When he refused, Amy divorced Patrick.  A default divorce decree was entered on February 24, 2008.  Amy told Patrick that he needed to get help with his alcohol consumption and the divorce was intended to motivate him to do so.

Patrick never moved out of the marital residence.  Amy and Patrick continued to live together and to function as a couple, raising their children and enjoying marital relations.  Patrick did seek help for his alcoholism, attending inpatient treatment in 2007, 2008, and 2009.[2]  Other than the times

---

[2]The treatment program in 2007 lasted two weeks, the 2008 program lasted 30 days, and the 2009 program lasted six months.  While attending treatment, Patrick lived at the treatment facilities.

when he attended inpatient treatment or when he was drinking, Patrick continued to reside with Amy and their children in their home in Rapid City. Patrick never had a separate residence.

Patrick continued to list the address at which he and Amy lived as his residence post-divorce.  The couple sent out Christmas cards featuring them and their children.  Patrick wrote letters in which he continued to refer to Amy as his "wife."  Many of the couple's friends did not even know that Amy and Patrick had divorced.

Following the divorce, Amy and Patrick had an agreement regarding child care, household and other expenses.  Patrick contributed $500.00 per month, a figure that coincided with his child support obligation pursuant to the stipulated divorce decree.  This $500 payment satisfied all Patrick's monetary obligations to the family and was his sole financial contribution.

During the divorce, Amy changed the beneficiary on her life insurance policy to her mother.  In 2010, after Patrick had finished a six-month treatment program for alcohol abuse the previous year, Amy changed the beneficiary designation on her own life insurance policy back to Patrick.  She indicated that she wanted Patrick to have the life insurance money if she should die.

Part of the divorce decree split an Individual Retirement Account ("IRA")in Patrick's name 50:50 between Patrick and Amy.  Patrick met with

Mr. Boyle to discuss this change in Patrick's IRA.  At that time, Mr. Boyle asked Patrick if he wanted to remove Amy as the beneficiary on his life insurance policy.  Patrick told Mr. Boyle he did not want to change his policy–he wanted Amy to remain as the beneficiary.  The post-divorce arrangement was the same as when the couple was married–Amy continued to pay the premiums on Patrick's policy every month out of her own personal checking account.  Patrick knew of and consented to this arrangement.  Amy would not have continued to pay the premiums on Patrick's policy if she had not been named as the beneficiary on that policy.

Patrick expressed this agreement to Hugh Boyle, the parties' financial advisor, at annual face-to-face meetings that the couple had with Mr. Boyle post-divorce.  The couple told Mr. Boyle of their divorce.  Mr. Boyle asked Patrick if he still wanted to keep Amy as the beneficiary on his policy.  Patrick told Mr. Boyle that he did want to keep Amy as the beneficiary.  Patrick told Mr. Boyle that he wanted Amy to have the proceeds of his life insurance policy.

Mr. Boyle did not have Patrick fill out any additional paperwork as Amy was already the beneficiary on the policy.  Specific post-divorce discussions occurred between Mr. Boyle and Patrick regarding Amy continuing as the beneficiary on Patrick's life insurance policy in the years 2009 and 2010.  In each instance, Patrick told Mr. Boyle that it was his intention that Amy remain as his beneficiary.  Patrick never changed the beneficiary designation on his life

insurance policy. Mr. Boyle never had Patrick fill out a new designation of beneficiary form post-divorce because Mr. Boyle did not believe such a re-designation was necessary. Mr. Boyle had no knowledge of SDCL § 29A-2-804 or the effect of that statute.

Patrick died on January 2, 2011. At the time of his death, all premiums had been timely paid by Amy. There were no contingent beneficiaries on Patrick's life insurance policy. There are no conflicting claims or claimants regarding the proceeds to this policy. Defendant Amy Jenson was and is the only person making a claim to the benefits.

This lawsuit was filed by American General because of a South Dakota probate statute, SDCL § 29A-2-804, which generally provides that a divorce automatically revokes any revocable disposition of property to an ex-spouse. This statute is discussed in more detail below. The two issues presented by Amy's motion are: (1) is the revocation provided by SDCL § 29A-2-804 absolute, or does it establish only a presumption which can be rebutted by showing a contrary intent on the part of the decedent, and (2) was there a "contract" between Patrick and Amy within the meaning of the exception to the revocation provided for under § 29A-2-804?

The court notes at the outset what is ***not*** at issue here: American General's obligation to pay out the proceeds from Patrick's life insurance policy. American General must pay those proceeds, but the question presented is

whether those proceeds go to Amy as the designated beneficiary under the policy, or whether they are paid into Patrick's estate.

## DISCUSSION

**A.    Summary Judgment Standard**

Under Rule 56(c) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law."  In determining whether summary judgment should issue, the court views the facts, and inferences from those facts, in the light most favorable to the nonmoving party.  See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).

Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); FED. R. CIV. P. 56(e)(each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).  In determining whether a genuine issue of material fact exists, the court views the evidence presented in light of which party has the burden of proof

8

under the underlying substantive law.  Id.  Summary judgment will not lie if

there is a genuine dispute as to a material fact, that is, if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.

The substantive law identifies which facts are "material" for purposes of a

motion for summary judgment.  Anderson, 477 U.S. at 247.  "Only disputes

over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment.  Factual disputes that are

irrelevant or unnecessary will not be counted."  Id. at 248 (citing 10A C.

Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2725, pp.

93-95 (1983)).  The Supreme Court has further explained that:

> the issue of material fact required by Rule 56(c) to be present to
> entitle a party to proceed to trial is not required to be resolved
> **conclusively** in favor of the party asserting its existence; rather, all
> that is required is that sufficient evidence supporting the claimed
> factual dispute be shown to require a jury or judge to resolve the
> parties' differing versions of the truth at trial.

Anderson, 477 U.S. at 248-49 (quoting First National Bank of Arizona v. Cities

Service Co., 391 U.S. 253, 288-89 (1968)(emphasis added)).  Essentially, the

availability of summary judgment turns on whether a proper jury question is

presented.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).

"The inquiry performed is the threshold inquiry of determining whether there is

the need for a trial-whether, in other words, there are any genuine factual

issues that properly can be resolved only by a finder of fact because they may

reasonably be resolved in favor of either party."  Anderson, 477 U.S. at 250.

9

American General cannot properly be said to oppose Amy's motion for summary judgment as it never affirmatively argues for entry of judgment against Amy and, as stated above, does not contest any of the facts asserted by her.  Nevertheless, a failure by an opposing party to resist summary judgment "does not automatically compel resolution of [the motion] in favor of" the movant.  United States v. One Parcel of Real Property, 27 F.3d 327, 329 n.1 (8th Cir. 1994); Canada v. Union Elec. Co., 135 F.3d 1211, 1213 (8th Cir. 1997).  Federal Rule of Civil Procedure 56(e) allows for the possibility that a party may fail to resist another party's assertion of fact.  When this happens, the court must still make a determination as to whether the moving party is entitled to judgment in her favor on the merits.  One Parcel of Real Property, 27 F.3d at 329 n.1.  See also Fed. R. Civ. P. 56(e)(3) (upon a party's failure to contest facts asserted by the movant, the district court may grant summary judgment *if* the facts and the law show that the movant is entitled to judgment in her favor).

**B.    Whether SDCL § 29A-2-804 Creates an Absolute Revocation or Only a Presumption of Revocation that May be Rebutted?**

This case is before the court on diversity jurisdiction.  Accordingly, the substantive law of the forum state–here, South Dakota–must be applied.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  Where there is no direct state court decision on point, this court must attempt to predict how the state court would decide the issue, using decisions from other jurisdictions as guides.

<u>Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.</u>, 387 F.3d 705, 715 (8th Cir. 2004).

Section 29A-2-804 of the South Dakota Codified Laws is adopted from the Revised Uniform Probate Code ("UPC").  The South Dakota statute provides that ". . . a divorce or annulment of a marriage . . . [r]evokes any . . . revocable disposition of property made by a divorced individual to a former spouse in a governing instrument . . ."  <u>See</u> SDCL § 29A-2-804(b)(1).

The proceeds of a  life insurance policy are a "disposition of property" covered by the statute.  Section 29A-2-804 defines "disposition of property" as follows:

(a)     In this section:

(1) "Disposition or appointment of property" includes a transfer of an item of property or any other benefit to a beneficiary designated in a governing instrument.

<u>See</u> SDCL § 29A-2-804(a)(1).

A "governing instrument is defined by the statute as:

"Governing instrument" means a will, trust, or other governing instrument executed by the divorced individual before the divorce or annulment of the individual's marriage to the former spouse.

<u>See</u> SDCL § 29A-2-804(a)(4).  The court notes that the statute commits the cardinal sin of using the term "governing instrument" to define the term "governing instrument,"  thus clouding the utility of the definition.  Nevertheless, "governing instrument" is elsewhere defined under the South

11

Dakota Code in a way which makes clear that a life insurance policy is a "governing instrument" which makes a "disposition of property."  See SDCL § 29A-1-201(19) (defining "governing instrument" to include insurance and annuity policies).  In addition the comments to the UPC indicate that this provision was expanded in 1990 to include "will substitutes" such as life insurance policies.  UPC § 2-804, cmt.

The beneficiary designation in a life insurance policy is a "revocable" disposition.  A "revocable" disposition is one that, "with respect to a disposition, appointment, provision, or nomination," "the divorced individual, at the time of the divorce. . . was alone empowered, by law or under the governing instrument, to revoke or cancel the designation in favor of the former spouse . . . whether or not the divorced individual then had the capacity to exercise the power."  See SDCL § 29A-2-804(a)(6).

Exceptions to the statutory revocation-upon-divorce provision are made where there exists, ***inter alia***, "a contract relating to the division of the marital estate made between the divorced individuals before or after the marriage, divorce, or annulment. . ."  See SDCL § 29A-2-804(b).  The divorcing spouses may also avoid the statutory revocation provided under § 29A-2-804(b) by expressly providing otherwise in the terms of the governing instrument.  Id.  In addition, a court order to the contrary will avoid the statutory revocation.  Id.

In situations covered by § 29A-2-804, the former spouse to whom the disposition would have been made is treated as having predeceased the decedent or having disclaimed the property.  Id. at (d).  A remarriage between the divorced spouses nullifies the statutory revocation and revives the previously-revoked disposition of property.  Id. at (e).  A third-party payor such as American General cannot be held liable for having made a payment of a benefit to an ex-spouse whose gift was revoked by action of the statute if it relied in good faith on the governing instrument and had no notice of the divorce.  Id. at (g)(1).  If the third-party payor had written notice of the divorce, it can be held liable for making a payment to an ex-spouse of the decedent.  Id.

Amy asserts that § 29A-2-804 merely creates a rebuttable presumption that can be overcome by showing an affirmative intention by the decedent post-divorce to maintain the disposition of property covered by the governing instrument, here Patrick's life insurance policy.  American General does not argue affirmatively to the contrary, but seeks the court's interpretation of the statute in view of the existing authorities.

The South Dakota Supreme Court has stated that "[s]tatutes are to be construed to give effect to each statute and so as to have them exist in harmony."  In re Estate of Meland, 2006 S.D. 22, ¶ 6, 712 N.W.2d 1, 2 (quoting In re Estate of Jetter, 1997 S.D. 125, ¶ 11, 570 N.W.2d 26, 29).  When interpreting uniform laws such as the UPC, courts are mandated "to effectuate

[their] general purpose to make uniform the law of those states which enact [them].” Id. (quoting Jetter, supra).  Interpreting SDCL § 29A-2-804 so as to be in harmony with other states which have adopted the same UPC provision is not an easy task, as will be seen below, because there is a split of authority in interpreting the provision.

The South Dakota Supreme Court has interpreted § 29A-2-804 on only one occasion--in Buchholz v. Storsve, 2007 S.D. 101, 740 N.W.2d 107.  In that case, Linda Buchholz died, leaving her ex-husband, Harold Storsve, as the named beneficiary to her state retirement plan.  Id. at ¶ 1, 740 N.W.2d at 109. The divorce decree between Linda and Harold did not address her retirement plan specifically.  Id. at ¶ 3, 740 N.W.2d at 109.  At the time of her death, Linda also left behind a surviving spouse from her second marriage, Walter Buchholz, who made a claim to the retirement plan proceeds.  Id.  The trial court entered judgment in favor of Linda’s surviving spouse, Walter, holding that § 29A-2-804 operated to revoke her designation of Harold as the beneficiary to her plan.  Id. at ¶5, 740 N.W.2d at 109-10.

The South Dakota Supreme Court affirmed.  Id. at ¶ 28, 740 N.W.2d at 114.  The court held that Linda’s retirement plan was a governing instrument that made a disposition of property.  Id. at ¶ 10, 740 N.W.2d at 110.  The primary issue on appeal was whether the statute had retroactive effect, as Linda and Harold’s divorce predated enactment of § 29A-2-804 by 20 years.  Id.

14

at ¶¶ 10-17, 740 N.W.2d at 110-13.  This, in turn, depended on whether § 29A-2-804 was a "rule of construction or presumption."  Id.

When South Dakota adopted the UPC in 1995, it provided that rules of construction and presumptions would apply retroactively to governing instruments that had been executed prior to 1995.  Id. at ¶ 11, 740 N.W.2d at 111 (citing SDCL § 29A-8-101(b)(2)).  The court, citing extensively to a Tenth Circuit decision, Stillman v. Teachers Ins. & Annuity Ass'n College Retirement Equities Fund, 343 F.3d 1311 (10th Cir. 2003), held that § 29A-2-804 was a rule of construction and, thus, should be given retroactive effect under the UPC.  Buchholz, 2007 S.D. at ¶ 12, 740 N.W.2d at 111.

The following passage from Stillman was quoted by the Buchholz court:

> The Uniform Probate Code provision on which [§ 2-804(b)] is modeled derives from the recognition "that when spouses are sufficiently unhappy with each other that they obtain a divorce, neither is likely to want to transfer his or her property to the survivor on death." . . .  Revocation-upon-divorce statutes "reflect the legislative judgment that when the transferor leaves unaltered a will or trust or insurance beneficiary designation in favor of an ex-spouse, this failure to designate substitute takers more likely than not represents inattention rather than intention." . . .  Thus, [§ 2-804] attributes an intent to the donor based on an assessment of a typical donor's intention.  We also note that this statutory attribution of intent is rebuttable.  It applies "[e]xcept as provided by the express terms of a governing instrument [such as an annuity contract], a court order, or a contract relating to the division of the marital estate . . ."

Id. (quoting Stillman, 343 F.3d at 1318 (citations omitted by Buchholz court)).

15

Harold also argued that Linda's inaction–her failure to remove him as beneficiary–indicated an intention on Linda's part to give her retirement plan proceeds to Harold. Id. at ¶ 16, 740 N.W.2d at 112. The court rejected this argument, noting that if inaction by a former spouse were sufficient to rebut the revocation-upon-divorce statute, then the statute's purpose would be "eviscerated." Id. at ¶ 16, 740 N.W.2d at 112. Instead, the court quoted an Arizona decision holding that if the donor wishes to retain a former spouse as the beneficiary post-divorce, the donor must evidence this intention in writing "and must otherwise comply with applicable policy terms." Id. at ¶ 16, 740 N.W.2d at 112 (quoting Estate of Lamparella, 210 Ariz. 246, 109 P.3d 959, 967 (Ct. App. Div. 1 2005) and citing Mearns v. Scharbach, 12 P.3d 1048 (Wash. 2000)).

Noting that Harold had not shown any evidence that Linda had ever read the annual statements she received from her retirement plan on which Harold was shown as the beneficiary, the court held that Harold "fail[ed] in his burden under SDCL 29A-2-804 to show Linda's inaction rises to a clear indication of a contrary intent to her decree of divorce from [Harold] and its complete division of their marital assets." Id. at ¶ 17, 740 N.W.2d at 112. This statement implies that the South Dakota Supreme Court viewed § 29A-2-804 as a rebuttable presumption, otherwise there would be no point in evaluating the quality of the evidence adduced by Harold.

16

Although the <u>Buchholz</u> decision is helpful to this court's analysis, it is not determinative.  The <u>Buchholz</u> decision involved a decedent donor who evinced no overt intent as to her desire to benefit Harold.  There was no evidence that she wanted to remove him as beneficiary, and there was no evidence that she wanted to keep him in that capacity.  In all likelihood, Linda's situation was the exact situation intended to be covered by UPC § 2-804:  inattention by a divorced donor.

Here, by contrast, Patrick made known his specific intention to benefit Amy by verbally expressing that intention to both Amy and to American General's agent, Hugh Boyle.  Mr. Boyle never asked Patrick to execute a new designation of beneficiary form in Amy's favor because he believed none was necessary.  Amy's claim to the benefits under Patrick's American General life insurance policy raises two questions:  (1) does SDCL § 29A-2-804 create a rigid rule of revocation, or is it a rebuttable presumption; and (2) if rebuttable, what evidence is sufficient to rebut the statutory presumption of revocation?

A case involving nearly-identical facts is an unreported decision from the District of Alaska, <u>State Farm Life Ins. Co. v. Davis</u>, 2008 WL 2326323 (D. Alaska 2008).  In that case, a husband and wife were married for 28 years. <u>Id.</u> at *1.  Five years prior to their divorce, the husband took out a life insurance policy on himself, naming his then-wife as the beneficiary.  <u>Id.</u>  The couple then divorced and the husband died four years later.  <u>Id.</u>  After the

17

divorce, the husband had verbally told an agent of the life insurance company that he wanted his former wife to remain as the beneficiary on his policy.  Id. The insurance agent in Davis, like Mr. Boyle in this case, did not have the husband execute any other document because she believed none was necessary since the ex-wife was already designated as the husband's beneficiary on the policy.  Id.  The direct issue presented in that case was the same as here:  did Alaska's revocation-upon-divorce statute (identical in effect to SDCL § 29A-2-804) create a rigid rule of revocation, or merely a rebuttable presumption that could be overcome by presenting evidence of a contrary intent on the part of the decedent?  Id. at *2.

The Alaska District Court reviewed decisions from Arizona and California and the Stillman decision involving similar statutes and concluded that the Alaska Supreme Court would decide that the rule, as a rule of construction, created only a rebuttable presumption.[3]  Id. at *4.  To overcome the presumption, the Davis court held that the wife must present proof by a preponderance of the evidence that the decedent actually intended her to be the beneficiary of the life insurance policy despite their divorce.  Id.

_____

[3]The Alaska District Court, as this court does, exercised jurisdiction over the Davis case by reason of the diverse citizenship of the parties and, thus, was required to apply state law.  Davis, 2008 WL 2326323 at *1.  Because no Alaska Supreme Court opinion on point existed, the Alaska District Court had to predict how the Alaska Supreme Court would decide the issue.  Id. at ** 2, 4.

18

The court noted that the evidence proffered by the wife was an oral statement by the decedent made to the insurance agent.  Id. at *5.  However, the court noted that this would not be considered hearsay because it was "a statement of the declarant's then existing state of mind" and thus, within the exception to the hearsay rule found at Fed. R. Evid. 803(3).  Id.  Having determined that the evidence proffered was admissible evidence, the court held that the wife had rebutted the statutory presumption by presenting proof of the decedent's contrary intent by a preponderance of the evidence.  Id.  The Davis decision has not been contravened by a higher federal court, nor has the Alaska Supreme Court disagreed with it.

An interpretation similar to the Davis holding was reached in Allstate Life Ins. Co. v. Hanson, 200 F. Supp. 2d 1012 (E.D. Wis. 2002).  In that case, a federal district court sitting in diversity stated that Wisconsin's version of UPC § 2-804 "presumptively revokes" an ex-wife's interest in decedent's life insurance proceeds.  Id. at 1017.  The court went on to explain that Wisconsin's revocation-upon-divorce statute "only created a default rule" and did not prevent the decedent "from maintaining" his former spouse as his life insurance beneficiary.  Id. at 1020.  The court stated that the decedent "merely had to perform some small affirmative act indicating his intent."  Id.  For example, the court stated he could have "altered the life insurance contract, executed some separate document, or even performed some informal act which

[the ex-wife] could use to show a court that she was still his intended

beneficiary."  Id.

However, the district court in the Eastern District of Wisconsin was

interpreting a slightly different version of UPC 2-804 than the one enacted in

South Dakota.  Id.  The Wisconsin statute provides that the revocation does not

take place in any of the following situations:

> 1.  the express terms of a governing instrument provide
>     otherwise.
>
> 2.  The express terms of a court order provide otherwise.
>
> 3.  The express terms of a contract relating to the division of the
>     decedent's and former spouse's property made between the
>     decedent and the former spouse before or after the marriage
>     or the divorce, annulment, or similar event provide
>     otherwise.
>
> 4.  The divorce, annulment or similar event is nullified.
>
> 5.  The decedent and the former spouse have remarried or
>     entered into a new domestic partnership before the death of
>     the decedent.
>
> **If the transfer is made under a governing instrument and the
> person who executed the governing instrument had an intent
> contrary to any provision of this section, then that provision
> is inapplicable to the transfer.  Extrinsic evidence may be used
> to construe the intent.**

See Wis. Statutes Ann. § 854.15(5) (emphasis supplied) (cited by Hanson, 200

F. Supp. 2d at 1020).  Thus, the Wisconsin statute being interpreted by the

Hanson court specifically contemplated that the statutory presumption might

be rebutted by "extrinsic evidence" and the statute did not require the

20

"extrinsic evidence" to be **written** evidence.  The South Dakota Supreme Court
cited <u>Hanson</u> favorably, albeit for its holding as to the retroactivity of the
statute.  See <u>Buchholz</u>, 2007 S.D. 101, ¶ 12, 740 N.W.2d at 112.  The <u>Hanson</u>
decision has also been cited favorably by district courts within the Eighth
Circuit for the same holding.  See <u>Lincoln Benefit Life Co. v. Heitz</u>, 468 F.
Supp. 2d 1062, 1068-69 (D. Minn. 2007) (citing to and relying on <u>Hanson</u> in
interpreting Minnesota's version of UPC § 2-804).

In <u>Coughlin v. Board of Admin. of the Pub. Employees' Retirement Sys.</u>,
199 Cal. Rptr. 286 (Ct. App, 2d Dist. 1984), the California Court of Appeal was
interpreting a California provision that revoked **all** beneficiary designations (not
just to an ex-spouse) under a state retirement system when the employee
divorced.  <u>Id.</u> at 287.  After the divorce was final (and the statutory revocation
had taken place), the employee could fill out a new designation of beneficiary
form and re-designate a new beneficiary or his former spouse.  <u>Id.</u>

In <u>Coughlin</u>, the husband had designated his wife as the beneficiary to
his plan.  <u>Id.</u>  Upon **initiating** divorce proceedings against his wife, the husband
filled out and filed with the state retirement system a new beneficiary form
designating his mother as the beneficiary.  <u>Id.</u>  However, because the statute
revoked **all** designations upon the happening of a divorce, when the husband's
divorce became final several months later, his designation of **his mother** as

beneficiary would have been statutorily revoked if the court had applied the California provision strictly.  Id. at 286-87.

The court declined to do so because it went against the clear manifestation of the husband's intent to benefit his mother.  Id. at 286-88. The court held that the statute was a rule of construction and, as such, should be liberally construed to give effect to the husband's intent.  Id. at 286.  Like SDCL § 29A-2-804, the California statute was intended to protect the inattentive donor after he or she divorces a former spouse.  Id. at 288.  The husband's only fault in attempting to carry out his intent was that he acted too promptly in changing the beneficiary designation–if he had procrastinated and waited until the divorce was final before redesignating his beneficiary, his mother would clearly receive the proceeds of his retirement plan.  Id. at 287-88.  The court refused to interpret the revocation-upon-divorce provision strictly and thereby achieve a result that was exactly the result the provision was intended to avoid–i.e. a result at odds with the decedent's intent.  Id. at 288.

The court noted that in prior decisions, technical lapses on the part of the decedent were not used against him to defeat his intent.  Id. at 287-88.  In one case, a decedent had properly filled out a designation of beneficiary form, but failed to file it with the state retirement system before he died.  Id. at 287 (citing Watenpaugh v. State Teachers' Retirement, 336 P.2d 165 (Cal. 1959)).

22

In another, a decedent had properly filled out the form and mailed it to the state retirement system, but it had not been filed prior to the decedent's death. Id. (citing Wicktor v. County of Los Angeles, 2 Cal. Rptr. 352 (Ct. App. 1960)). In both cases, the court employed a liberal rule of construction to do justice to the decedent's intent.  Id.

The Coughlin court rejected an argument that its interpretation would muddy what would otherwise be a "bright-line" rule.  Id. at 288-89.  The court noted that, before enactment of the revocation-upon-divorce provision, the law in California was the opposite:  that a designation of beneficiary form would be given effect regardless of divorce.  Id. at 288.  After enactment of the provision, the law in California was that the designation prior to the divorce would not be given effect.  Id.  Each rule was equally clear according to the Coughlin court. Id.  Nothing in the legislative history indicated that the California legislature wished to obliterate the liberal rule of construction to effectuate a decedent's intent, which rule pre-dated the enactment of the revocation-upon-divorce rule by eleven years.  Id.

A case presenting a stark contrast to Davis, Hanson, and Coughlin is Mearns v. Scharbach, 12 P.3d 1048 (Wash. 2000).  In that case, the decedent/husband had taken out several life insurance policies and also had a retirement plan.  Id. at 1050-51.  His ex-wife was named as beneficiary in all these "governing instruments."  Id.  The decedent divorced his wife and a few

weeks later, called his insurance agent to cancel one of the life insurance policies on which his ex-wife was a designated beneficiary.  Id. at 1050.  The insurance agent reminded the decedent that there was a second life insurance policy through the Guardian Life Insurance Company that also named the ex-wife as beneficiary.  Id.  The decedent stated that he wished his ex-wife to remain as the beneficiary on the Guardian policy.  Id.  The agent did not have the decedent re-designate his ex-wife as beneficiary.  Id.

Seven months later, the decedent contacted his employer and changed all the beneficiaries on his retirement plan and on his life insurance policies through his employer which named his ex-wife as beneficiary.  Id.  The decedent substituted his adult children as beneficiaries on these "governing instruments."  Id. at 1050-51.  When making these changes, the decedent told the human resources employee that he intended to change the beneficiary status from his ex-wife to his adult children on some, but not all, of his policies.  Id. at 1051.  The decedent died within a few months of making these changes.  Id. at 1050-51.

The ex-wife submitted a claim for the proceeds from the Guardian life insurance policy on which she remained the named beneficiary, but the adult children contested her right to the proceeds.  Id. at 1051.  The children argued that Washington's version of UPC § 2-804 revoked the designation of the ex-wife as beneficiary on the Guardian policy.  Id.

24

The Court of Appeals of Washington held that the provisions of the Washington statute were automatic upon the divorce, and that in order for the decedent to have maintained the ex-wife as beneficiary, it would have been necessary for him to redesignate her as beneficiary after the divorce was final. Id. at 1052.  The ex-wife argued that the statute was a remedial statute the sole purpose of which was to devine a decedent's intention.  Id.  Since there was evidence of her ex-husband's contrary intention in this case, she argued that the statute did not apply.  Id.  The court rejected this argument, stating that the Washington legislature had adopted its statutory revocation provision in response to a particular case that had been decided and that there was legislative history indicating that the legislature wanted an automatic, bright-line rule rather than a rule intended to discern a decedent's intent.  Id. at 1052-53.

The ex-wife also argued that, although the statute required a post-divorce redesignation of her as beneficiary, the statute did not require that redesignation to be in writing.  Id. at 1053.  The decedent's oral statements, she argued, were a redesignation within the meaning of the statute.  Id. Relying on legislative history, which showed that the legislators were told that the statute required a writing, the Court of Appeals also rejected this argument by the ex-wife.  Id.  The court affirmatively held that the decedent, if he wished

his ex-spouse to continue to benefit under a life insurance policy or will post-divorce, had to execute a writing to that effect.  Id.

The South Dakota Supreme Court, in rejecting the ex-husband's argument that the decedent's inaction showed she wanted him to remain as beneficiary, cited Mearns with approval for the proposition that if an ex-spouse wanted to avoid the application of the statute, there must be a writing post-divorce that specifically reaffirmed the decedent's intention to have the ex-spouse benefit under the policy.  Buchholz, 2007 S.D. 101, ¶ 16, 740 N.W.2d at 112-13.

Besides the Mearns decision, the other case cited by the South Dakota Supreme Court for the proposition that the presumption of revocation must be rebutted in writing is In re Estate of Lamparella, 109 P.3d 959 (AZ Ct. App. 2005).  In that case, the decedent, like Linda in the Buchholz case, never changed a beneficiary designation after his divorce.  Id. at 960-61.  The ex-wife, like Harold, argued that her husband's inaction represented an affirmative decision that she should remain as beneficiary on an annuity policy.  Id. at 961.  In addition, the ex-wife submitted an affidavit averring that her ex-husband had told her he intended that she remain as the beneficiary, that the ex-husband had hoped for a reconciliation, and that he had "loved [her] until the day he died."  Id. at 962.

26

The Court of Appeals soundly rejected the ex-wife's florid self-serving testimony, which no other witness confirmed having heard from the decedent. Id. at 964-65.  The court cited Mearns for the proposition that the decedent must have redesignated his ex-wife as the beneficiary of the annuity in writing in order to rebut the statutory revocation-upon-divorce presumption.  Id.

In a subsequent decision, the Arizona Court of Appeals held that it would not apply Arizona's revocation-upon-divorce statute where to do so did not advance the purpose of the statute.  See In re Estate of Rodriguez, 160 P.3d 679, 686-87 (AZ Ct. App. 2007).  In that case, Kathryn and Mauro had been married in 1988.  Id. at 681.  Unbeknownst to Kathryn, Mauro was married to someone else at the time, his previous marriage not being dissolved until 1989. Id.  Kathryn died, leaving a will designating Mauro as a beneficiary.  Id.  The lower court had ruled that Kathryn's marriage to Mauro was void **ab initio**, that the probate court's declaration of the invalidity of the marriage was a "declaration of invalidity" under Arizona's revocation-upon-divorce statute, and that the declaration of invalidity of the marriage triggered the revocation-upon-divorce statute, revoking any bequest to Mauro under Kathryn's will.  Id. at 682.

The Rodriguez court stated that the statute "rests on the belief that a spouse who has terminated his or her marriage will not usually wish to leave any part of his or her estate to the former spouse."  Id. at 686.  The court held

that the purpose of the statute would not be advanced under these facts, where Kathryn and Mauro did not terminate their marriage, but rather a court declared it to be invalid after Kathryn's death.  Id.  This contravened the general rule that "a man may dispose of his property as he sees fit, regardless of the fact that the prevailing code of morals may consider such disposition as unwarranted from any standpoint."  Id.  The court held that the fact that Mauro was not validly married to Kathryn did not interfere with Kathryn's freedom to dispose of her property as she saw fit.  Id. at 687.

Two decisions do not affirmatively endorse the position of the Mearns court, but are somewhat in the same vein.  The Colorado Supreme Court decided that Colorado's version of UPC § 2-804 did not violate the constitution by applying retrospectively to life insurance contracts that had been executed prior to the enactment of the revocation-upon-divorce provision.  In re Estate of DeWitt, 54 P.2d 849, 859-61 (Colo. 2002).  In discussing the statute, the DeWitt court stated that "[§ 2-804] merely creates a default rule.  It did not prevent [the] decedent from maintaining his former spouse as his designated beneficiary under the contract.  Instead, *[the] decedent merely needed to comply with the statute to maintain that designation.*"  Id. at 860 (citing specifically to part (2) of the Colorado statute, which corresponds to part (b) of the South Dakota statute) (emphasis supplied).  Thus, the Colorado court stated in dicta that the statute creates a rebuttable presumption, but implied

28

that the only way to rebut the presumption is to satisfy one of the three specific exceptions found in the statute.  Id.

In Aetna Life Ins. Co. v. Schilling, 616 N.E.2d 893 (Ohio 1993), the Supreme Court of Ohio held that Ohio's version of UPC § 2-804 **was** unconstitutional.  Id. at 896.  The facts in that case were that the decedent had died just twenty days after the enactment of the revocation-upon-divorce provision, his divorce having occurred thirteen years prior to his death.  Id. at 894.  In analyzing the statute, the Schilling court stated in dicta that the only way the decedent could have avoided the statutory revocation would have been if his divorce decree contained a specific contrary agreement, if the beneficiary designation itself specifically provided to the contrary, or if the decedent–in the 20 days between enactment of the statute and his death–had redesignated his ex-wife as the beneficiary on his policy.  Id. at 896, 896 n.2.  See also Matter of Estate of Dobert, 963 P.2d 327, 333 (AZ 1998) (noting that a insured/decedent could avoid the application of Arizona's version of UPC § 2-804 by designating the former spouse as his beneficiary after the divorce).

Given the above cases, this court is faced with the proposition of choosing between the Davis line of authority and the Mearns line of authority in trying to predict how the South Dakota Supreme Court would decide this issue.  The Stillman court–relied on the most heavily by the Buchholz court-- noted that a rule of construction in the law of donative transfers is a rule that

aids "in determining and giving effect to the donor's intention or probable intention . . ." Stillman, 343 F.3d at 1317 (quoting Restatement (Third) of Property: Wills & Other Donative Transfers § 7.2 cmt. a (2001)).  The Stillman court noted that the approach under the UPC, of which § 2-804 is a part, was to withdraw the prior emphasis on legal formalism in interpreting wills, trusts and other transfers and instead to favor policies that fulfilled the intent of the donor.  Id. (citing Prefatory Note to Revised Article II, Uniform Probate Code at 75 (1990)).

The Stillman court went on to note that application of a "rule of construction is not insuperable; *it can be overcome by a clear expression of contrary intent*." Id. (emphasis supplied).  The Stillman court affirmatively held, as did the Buchholz court, that UPC § 2-804 was a rule of construction. Id.; see also Buchholz, 2007 S.D. ¶ 11, 740 N.W.2d at 111.  Nevertheless, a conclusion that the statute *can* be rebutted begs the question of *how* must it be rebutted.

The Stillman court relied, in part, on a law review article written by Professor Lawrence Waggoner.  See 26 Real Property Probate and Trust Jrnl., Winter 1992 Spousal Rights in Our Multiple-Marriage Society:  The Revised Uniform Probate Code, Lawrence W. Waggoner,  683, page 699.  In that article, Professor Waggoner wrote that the presumption established by UPC § 2-804 "yields to a contrary intention."  Id.  The Stillman court accorded "particular

respect" to the interpretation of § 2-804(b) by Professor Waggoner because he had a prominent role in drafting the UPC.  <u>Stillman</u>, 343 F.3d at 1319 (citing UPC § 2-804 at 221).  The court also noted that the Commentary to UPC § 2-804 cites Professor Waggoner's law review article approvingly.  <u>Id.</u>

The court notes that Eighth Circuit has had occasion to interpret Oklahoma's version of UPC § 2-804.  <u>See</u> <u>Whirlpool v. Ritter</u>, 929 F.2d 1318 (8th Cir. 1991).  In <u>Whirlpool</u>, the issue was whether an Oklahoma revocation-upon-divorce statute should be applied retroactively.  <u>Whirlpool</u>, 929 F.2d at 1319-20.  The decedent had obtained life insurance naming his then-wife as beneficiary.  <u>Id.</u> at 1319.  Two years later, Oklahoma passed its revocation-upon-divorce statute.  <u>Id.</u> at 1319-20.  The decedent died two years after the law was enacted.  <u>Id.</u> at 1320.  Thus, the court was presented with the question whether retroactive application of the statute to a contract that had been created before the effective date of the statute was constitutional.  <u>Id.</u>  The Eighth Circuit concluded that the Oklahoma statute violated the contracts clause of the United States Constitution.  <u>Id.</u>

The <u>Whirlpool</u> decision is inapplicable to this case.  First, as noted above, the controlling law here is South Dakota state law and the South Dakota Supreme Court has rejected the <u>Whirlpool</u> analysis.  <u>See</u> <u>Buchholz</u>, 2007 S.D. ¶¶20-28, 740 N.W.2d at 113-15.  Secondly, the issue in <u>Whirlpool</u> was the constitutionality of applying the statute retroactively, while Amy's case

presents no constitutional issues regarding retroactive application of the statute:  Patrick first obtained the life insurance policy naming Amy as beneficiary more than a decade after the South Dakota legislature enacted SDCL § 29A-2-804.  Thus, the issues in Whirlpool are not presented here.[4]

Returning to the question of how the South Dakota Supreme Court would decide this issue, this court believes that, faced with the undisputed facts present in this case, the South Dakota Supreme Court would adopt the position outlined in the Davis and Hanson decisions.

The South Dakota Supreme Court has already decided that SDCL § 29A-2-804 is a rule of construction.  Buchholz, 2007 S.D. 101, ¶ 12, 740 N.W.2d at 111.  That is a two-edged sword.  While on the one hand it means the legislature can provide for retroactive application of the statute without running afoul of the Constitution, it also means that the rule must give way to a decedent's contrary intention.  Stillman, 343 F.3d at 1318; Hanson, 200 F. Supp. 2d at 1020; Coughlin, 199 Cal. Rptr. at 286; 26 Real Property Probate

---

[4]The court also notes that Whirlpool and the line of cases it spawned "has been persuasively criticized by other distinguished authorities.  After Whirlpool was decided, the Joint Editorial Board for the Uniform Probate Code issued a statement asserting that the opinion was 'manifestly wrong.' " Stillman, 343 F.3d at 1322.  See also Lincoln Benefit Life Co. v. Heitz, 468 F. Supp. 2d 1062, 1068 (D. Minn. 2007) (distinguishing Whirlpool and refusing to follow it); In re Estate of DeWitt, 54 P.3d 849, 859-60 (Colo. 2002) (rejecting analysis of Whirlpool court).

and Trust Jrnl., Winter 1992 <u>Spousal Rights in Our Multiple-Marriage Society:</u> <u>The Revised Uniform Probate Code</u>, Lawrence W. Waggoner,  683, page 699.

How must a beneficiary show sufficient intent on the part of the decedent?  The beneficiary must present proof by a preponderance of the evidence that the decedent actually intended her to be the beneficiary of the life insurance policy despite their divorce.  <u>Davis</u>, 2008 WL 2326323 at ** 4-5.  In order to meet this standard, showing mere inaction by the decedent is clearly insufficient to carry the would-be beneficiary's burden.  <u>Buchholz</u>, 2007 S.D. 101, ¶ 16, 740 N.W.2d at 112; <u>Lamparella</u>, 109 P.3d at 961-65.  In addition, self-serving statements made by the decedent only to the beneficiary and not witnessed by any other person are insufficient.  <u>Lamparella</u>, 109 P.3d at 961-65.  Such evidence has too great a tendency to be self-serving and has insufficient "guarantees of trustworthiness" to carry the day.  Clearly, providing a writing from the decedent in compliance with the terms of the life insurance policy ***would*** satisfy the beneficiary's burden.  <u>Lamparella</u>, 109 P.3d at 966; <u>Mearns</u>, 12 P.3d at 1053.

The evidence in this case falls between those two extremes:  Amy does not rely on mere inaction by Patrick to make her case, nor on statements allegedly made to her alone.  She relies on statements made by Patrick to a financial expert for the purpose of obtaining financial advice.  The court notes that the statements made by Patrick would be admissible under Fed. R. Evid.

33

803(3), a contemporaneous statement of a then-existing mental condition or state of mind to show intent.  Evidence admissible under a long-recognized rule of evidence has been held to hold sufficient guarantees of trustworthiness to make it reliable.  United States v. Barraza, 576 F.3d 798, 805 (8th Cir. 2009).

Although Amy does not have a separate writing from Patrick evidencing his intentions, the court finds that the evidence adduced by Amy in this case satisfies her burden of proof.  Here, Patrick made his intentions known not only to Amy, but to his financial advisor whom he trusted to carry out his wishes with regard to his estate planning.  Mr. Boyle held himself out to Amy and Patrick as having expertise in the area of estate planning.  Patrick cannot be faulted for failing to know more about how to carry out his estate plan than did American General's own agent.  Thus, Patrick's oral statement that he wanted Amy to remain as his beneficiary was witnessed by a neutral third-party who had no interest in who was named as Patrick's beneficiary.  Moreover, this third-party was exactly the person Patrick expected to apply his body of specialized knowledge to ensure that Patrick's wishes were carried out.

In addition, the terms of the policy gave Patrick no notice that he needed to do anything else to carry out his wishes.  No specific reference is made in the policy to the effect of divorce or to SDCL § 29A-2-804.  The policy told Patrick that once he designated a beneficiary, his designation would remain in full

34

force and effect until he notified American General in writing of a contrary intention.

The court also notes that SDCL § 29A-2-804 provides that the revocation-upon-divorce is negated if the parties remarry–and the parties do not have to do anything to effectuate the negation.  See SDCL 29A-2-804(e). Although South Dakota does not recognize common law marriage, and the court is not suggesting that Amy and Patrick were married at the time of Patrick's death, nevertheless, it is clear that they had made a determination to remain together as a couple indefinitely.  This bolsters the court's conclusion that it was Patrick's intention to have Amy remain as his beneficiary.

The court notes that, had Amy been the first one to die, the law would have honored her intent to have Patrick benefit under her life insurance policy due to the mere fortuity that she had re-designated him after their divorce was final.  It would be perverse to give effect to Amy's designation of Patrick as the beneficiary on her life insurance policy and not to give effect to Patrick's designation of Amy.  Both designations sprang from the same impulse on the part of the couple to have in place mirror-image life insurance policies as part of their joint estate plan.  It would be doubly-perverse to reach a conclusion contrary to Patrick's clearly expressed intent by using a "rule of construction" to arrive at that conclusion.  Coughlin, 199 Cal. Rptr. at 288.

35

The court has done its best to devine how the South Dakota Supreme Court would decide this case.  The <u>Buchholz</u> decision contains conflicting indications.  On the one hand, the court cited <u>Lamparella</u> and <u>Mearns</u> for the proposition that the decedent's post-divorce intent must be expressed in writing.  <u>Buchholz</u>, 2007 S.D. 101, ¶16, 740 N.W.2d at 112.  However, when Harold alleged that Linda's inaction evinced an intent that he benefit under her plan, the court evaluated that evidence and stated that Harold had not shown that Linda had read the statements from the plan showing him as the listed beneficiary.  <u>Id.</u> at ¶ 17, 740 N.W.2d at 112.  Why would the court make this observation if the only method of proof was to provide a writing?  It suggests that there may be quantums of proof less than a writing that would suffice.

And both <u>Mearns</u> and <u>Lamparella</u> are distinguishable.  In <u>Mearns</u>, the Washington legislature had enacted its statute to overturn a specific decision of the Supreme Court of Washington which was widely criticized.  <u>Mearns</u>, 12 P.3d at 1052 (discussing <u>Aetna Life Ins. Co. v. Wadsworth</u>, 689 P.2d 46 (Wash. 1984)).  Furthermore, there is legislative history in Washington and this history shows that the legislature believed that the presumption provided in its statute could be overcome only by providing a writing to the contrary.  <u>Id.</u> at 1053.  The <u>Mearns</u> court specifically held that its statute was ***not*** a mere rule of construction intended to discern the intent of the decedent.  <u>Id.</u>  South Dakota does not have legislative history, so we do not have the same explicit backdrop

against which SDCL § 29A-2-804 can said to have been enacted.  And the South Dakota Supreme Court, unlike the <u>Mearns</u> court, has held that SDCL § 29A-2-804 *is* a rule of construction.

The <u>Lamparella</u> decision, like <u>Buchholz</u> itself, can best be understood with reference to the facts in that case:  both ex-spouses alleged "evidence" of the decedent's intent that was inherently unreliable.  <u>Lamparella</u>, 109 P.3d at 961-65.  Furthermore, when the Arizona Supreme Court was subsequently called upon to enforce a strict construction of its revocation-upon-divorce statute, it refused to do so, stating that the statute was a rule of construction intended to give effect to a decedent's intent and that it would not apply the rule where to do so would not further the purpose of the statute.  <u>In re Estate of Rodriguez</u>, 160 P.3d at 686-87.

This court interprets <u>Buchholz</u> to hold that a writing is sufficient to rebut the effect of SDCL § 29A-2-804, but that a writing is not the exclusive way to rebut the statute.  The court further concludes that Amy has carried her burden of rebutting the statutory presumption.

**C.    Whether Amy and Patrick Had a "Contract" Within the Meaning of the Exception to the Revocation Brought About by § 29A-2-804?**

As an alternative argument to her assertion that § 29A-2-804 creates only a rebuttable presumption, Amy argues that she and Patrick had a "contract" within the meaning of the exception to the statute.  Reiterating, § 29A-2-804 provides for revocation upon divorce "except as provided by the

37

express terms of a governing instrument, a court order, or a contract relating to the division of the marital estate made between the divorced individuals before or after the marriage, divorce, or annulment . . ."  See § 29A-2-804(b).  Again, the Buchholz decision is this court's only guidance as to how the South Dakota Supreme Court would interpret this provision.

In that case, Harold, Linda's ex-husband, argued that the first exception applied because the "express terms of" Linda's retirement plan named him as the beneficiary.  Buchholz, 2007 S.D. at ¶ 13, 740 N.W.2d at 112.  The South Dakota Supreme Court rejected Harold's interpretation, noting that if his interpretation prevailed, § 29A-2-804 would never have any application because every governing instrument would specifically name the ex-spouse as the recipient of the property.  Id. at ¶ 14, 740 N.W.2d at 112.  Instead, the court held that in order for the express terms of a governing instrument to fit within the first exception stated in the statute, the express terms must refer specifically to divorce and state that the beneficiary will remain the same as the designated beneficiary despite divorce.  Id. at ¶ 15, 740 N.W.2d at 112.

The South Dakota Supreme Court has not addressed the "contract" exception, however.  This court has found only one case interpreting that provision in light of an argument that the decedent and the former spouse had an "oral contract."  See Lincoln Benefit Life Co. v. Heitz, 468 F. Supp. 2d 1062 (D. Minn. 2007).  In the Heitz case, the federal district court was called upon to

38

interpret a Minnesota statute nearly identical to UPC § 2-804 and SDCL § 29A-2-804.  Id. at 1066, 1066 n.2.  Under the facts of that case, the decedent and his ex-wife had divorced three years before the decedent died.  Id. at 1064-65.

During the interim between the divorce and his death, the decedent had contacted his life insurance company four times, and had asked that his ex-wife be removed as an additional insured from his account, and that his ex-wife be "removed from my account," but the decedent never asked the insurance company to remove his ex-wife as the beneficiary on the life insurance policy.  Id. at 1065.  After holding the Minnesota statute to be constitutional, the court turned to the ex-wife's argument that she and the decedent had an oral agreement that she remain the beneficiary, which would have satisfied one of the exceptions to the revocation-upon-divorce statute.  Id. at 1069-70.

The district court held that contracts could be entirely oral under Minnesota law, but that the proponent of such a contract must show definite and certain terms of the contract by clear and convincing evidence.  Id. at 1069.  The ex-wife could not provide any specific details of the oral contract.  Id.  She admitted that she gave no consideration, that there was no specific duration to the contract, and that she did not know when the contract was formed.  Id.  The court rejected her argument that she fit within the exception to UPC § 2-804 because she could not meet the requirements of Minnesota law

for proving an oral contract.  Id. at 1069-70.  The court thus left open the possibility that an oral contract ***could*** satisfy the exception to UPC § 2-804.[5]  Id.

South Dakota law, like Minnesota law, recognizes the validity of oral contracts.  South Dakota defines a contract as an agreement to do or not to do a certain thing.  See SDCL § 53-1-1.  The essential elements of a contract are: (1) parties capable of contracting, (2) their consent, (3) a lawful object, (4) and sufficient cause or consideration.  See SDCL § 53-1-2.  A contract can either be express or implied, and if implied, the terms are not stated in words but are instead manifested by conduct.  See SDCL § 53-1-3.

Contracts may be oral except those that are required to be in writing by statute.  See SDCL § 53-8-1.  Four types of contracts are required by statute to be in writing: (1) those that by their terms cannot be performed within a year from the making of the contract, (2) an agreement made upon consideration of marriage other than a mutual promise to marry, (3) contracts for the sale of interests in real estate, and (4) an agreement for a loan of money or for an

---

[5]The Heitz decision was criticized by another district court decision in the District of Minnesota, but the criticism was directed at the Heitz court's refusal to follow the Eighth Circuit's decision in Whirlpool in determining that the retroactive application of Minnesota's statute did not violate the contract clause of the United States Constitution.  See MONY Life Ins. Co. v. Ericson, 533 F. Supp. 2d 921 (D. Minn. 2008).  Neither MONY nor Heitz were appealed to the Eighth Circuit and neither decision has been cited by any other court.

extension of credit which can be enforced by a beneficiary for whom the agreement was made.  See SDCL § 53-8-2.

Where the statute of frauds is raised as a defense, the party asserting the existence of the contract may nevertheless recover on ***quantum meruit*** if the party raising the statute of frauds defense has himself received the benefit of the invalid promise.  Clement v. Rowe, 33 S.D. 499, 146 N.W. 700, 702 (S.D. 1914).  Where a contract is for an indefinite period of time and it is possible that the contract will be performed within statute of frauds time period, the statute of frauds is not a defense.  Illinois Cent. R. Co. V. Byrd, 44 So. 3d 943, 949 (Miss. 2010); Acoustic Innovations, Inc. V. Schafer, 976 So. 2d 1139, 1143 (Fla. 2008); Mackay v. Four Rivers Packing Co., 179 P.3d 1064, 1068 (Idaho 2008); Balmer v. Elan Corp., 261 Ga. App. 543, 545, 583 S.E.2d 131, 133 (2003); Worley v. Wyoming Bottling Co., Inc., 1 P.3d 615, 622 n.1 (Wyo. 2000); Sherman v. Haines, 652 N.E.2d 698, 700 (Ohio 1995).  Where an oral contract was for one party's lifetime or "until retirement," the contract did not run afoul of the statute of frauds because the contract is "capable of" being performed within a year as the party could die within a year.  Mackay, 179 P.3d at 1068; City of New York v. Heller, 127 Misc. 2d 814, 487 N.Y.S.2d 288, aff'd, 131 Misc. 2d 485, 503 N.Y.S.2d 995 (AT1 1985).  Only where the performance of the contract must, of necessity, take place longer than one year is the statute of

frauds a defense.  Muoz v. Kaiser Steel Corp., 156 Cal. App. 3d 965, 971, 203 Cal. Rptr. 345, 348 (1984).

"True contracts grow out of the intention of the parties.  Where the intention is expressed in words, the contract is express.  A contract is implied in fact where the intention as to it is not manifested by direct or explicit words by the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used, or acts done by them, or other pertinent circumstances attending the transaction.  The difference lies in the manner of manifesting assent and an express contract and one implied in fact involve no difference in legal effect."  Mahan v. Mahan, 80 S.D. 211, 214-15, 121 N.W.2d 367, 369 (1963).  See also Setliff v. Akins, 2000 S.D. 124, ¶ 12, 616 N.W.2d 878, 885 (quoting Weller v. Spring Creek Resort, Inc., 477 N.W.2d 839, 841 (S.D. 1991) (quoting Mahan, 80 S.D. at 215, 121 N.W.2d at 369)).

Oral contracts or contracts implied in fact must be proved by clear and convincing evidence.  Mahan, 80 S.D. at 215, 121 N.W.2d at 369.  Courts must consider "the totality of the parties' conduct to learn whether an implied contract can be found."  In re Estate of Regennitter, 1999 S.D. 26, ¶ 12, 589 N.W.2d 920, 924.  See also Lien v. McGladrey & Pullen, 509 N.W.2d 421, 423-23 (S.D. 1993).  The existence of a valid contract is a question of law for the court to determine.  In re Neiswender, 2000 S.D. 112, ¶ 9, 616 N.W.2d 83, 86.

"In determining whether an implied contract exists, [the South Dakota Supreme Court] held that '[t]he pertinent inquiry is whether the facts and circumstances properly evaluated permit an inference that services were rendered in expectance by one of receiving and the other of making compensation.' " Setliff, 2000 S.D. at ¶ 13, 616 N.W.2d at 885 (quoting Mahan, 80 S.D. at 215, 121 N.W.2d at 369).  The facts must be "viewed objectively and if a party voluntarily indulges in conduct reasonably indicating assent he may be bound even though his conduct does not truly express the state of his mind." Id. (quoting Weller, 477 N.W.2d at 841 (quoting Federal Land Bank of Omaha v. Houck, 68 S.D. 449, 463, 4 N.W.2d 213, 219-20 (1942))).  Where an implied contract is alleged, the court must "closely examine the course of conduct between the parties.  The ' "[c]onduct" can be both acts and words.  By its very nature, an implicit agreement is not as detailed as a written agreement formally negotiated.' " Id. (quoting In re Estate of Regennitter, 1999 S.D. 26, ¶ 12, 589 N.W.2d 920, 924 (quoting Jurrens v. Lorenz Mfg. Co., 1998 S.D. 49, ¶ 9, 578 N.W.2d 151, 154 (quoting Mathews v. Twin City Const. Co., 357 N.W.2d 421, 423-24 (S.D. 1993)))).

There is no legal distinction between the legal effect of an express contract and that of an implied contract.  St. John's First Lutheran Church v. Storsteen, 77 S.D. 33, 37, 84 N.W.2d 725, 727 (S.D. 1957).  "The distinction between them is in the way in which mutual assent is manifested.  In an

express contract the terms are stated by the parties.  In an implied contract they are inferred from the circumstances." Id.

Here, the court holds that an oral contract can meet the requirements of the contract exception to SDCL § 29A-2-804(b).  The court further holds that Amy has met her burden of proving the elements of the oral contract between she and Patrick by clear and convincing evidence.  The consideration Amy gave was the payment of the monthly premiums on Patrick's life insurance policy each and every month.  The consideration Patrick gave was naming Amy as the beneficiary on his life insurance policy and the agreement to pay $500.00 toward household expenses.  The agreement was month to month.  The agreement does not run afoul of the statute of frauds because either party could have ended the agreement at any time, or Patrick could have died at any time.  Thus, the agreement did not by necessity require performance outside of the one-year time frame set forth by the statute of frauds.

The court expresses some doubt as to whether a payment of support like Patrick's of $500 pursuant to a divorce decree would satisfy the contract exception under SDCL § 29A-2-804 in most ordinary circumstances.  That is because, under ordinary circumstances, the ex-spouse making the support payment would be responsible for paying the premiums on his own life insurance policy.  A fact which serves to distinguish Amy and Patrick's situation from the ordinary payment of support following a divorce is their

agreement that Amy would, in return for receipt of Patrick's support payment, agree to pay his life insurance premiums.  She was not otherwise obligated to do so and she has presented sworn, uncontradicted testimony that she would not have made those payments if Patrick had not agreed to maintain her as the beneficiary.  As an alternative holding, then, the court holds that Amy is entitled to the proceeds of Patrick's policy because she has satisfied the contract-exception requirement under SDCL § 29A-2-804.

## CONCLUSION

The court recommends that Amy's motion for summary judgment [Docket No. 15] be granted and that judgment be entered in her favor declaring that she is the lawful beneficiary of Patrick Jenson's life insurance policy with American General.

## NOTICE TO THE PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained.  See also Fed. R. Civ. P. 72(b)(2).  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to

require **de novo** review by the district court.  See <u>Thompson v. Nix</u>, 897 F.2d

356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

Dated March 12, 2012

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE